JONES SPECIAL MACH. CO. v. PENTUCKET VARIABLE STITCH
SEWING-MACH. CO.

(Circuit Court of Appeals, First Circuit. October 17, 1900.)

No. 289.

PATENTS—INFRINGEMENT—SEWING MACHINES.

The Woodward patent, No. 354,499, for a sewing machine, describes a machine the only novel feature of which is the combination of a universally movable work feeder with an automatic thread holding and releasing device, both of which devices, used separately, were old, and, if the combination of the patent be conceded invention, the claims are entitled only to a narrow construction, and must be restricted to the precise construction described. As so limited, claims 4 and 6 of the patent held not infringed.

Appeal from the Circuit Court of the United States for the District of Maine.

George O. G. Coale, for appellant.
William Quinby, for appellee.

Before COLT, Circuit Judge, and ALDRICH and BROWN, District Judges.

BROWN, District Judge.   The patent in suit is No. 354,499, dated December 14, 1886, issued to the appellee, as assignee of Woodward, for a sewing machine.   The questions in the circuit court were of the validity of the patent, and of infringement, and were decided in favor of the complainant below.   93 Fed. 669.   We will use the words "complainant" and "defendant" to signify the relation of the parties to the original proceeding in the circuit court.

Claims 4 and 6, whereof infringement is charged, are as follows:

"(4) In a sewing machine of the class described, having a universally movable work feeder, the combination, with the needle, shuttle, automatic work feeder, and a tension device adapted to produce a constant tension on the thread, of automatic thread holding and releasing devices, substantially as described, whereby the needle thread is held while the shuttle is entering the needle loop, and released while the work is being moved by the work feeder, as set forth."

"(6) The combination of the needle, the shuttle, the work feeder, an automatic thread grasping and releasing device, and a tension device, all arranged and operating substantially as and for the purpose specified."

In the prior art is the closely-related patent to Woodward & Keith, No. 316,927.   The subject-matter of the two patents is stated in each in the following words:

"This invention has for its object to provide a sewing machine capable of forming elongated stitches on the surface of material to be ornamented, and of arranging said stitches in a variety of ornamental forms."

The machine of each patent has a "universally movable work feeder," which arranges the stitches in a variety of ornamental forms. The earlier machine was particularly adapted to leather work or to use upon stiff material.   Woodward, who was one of the patentees of the earlier patent and the inventor of the device of the patent in suit, was led to make changes in the earlier machine by the suggestion of a manufacturer of knit goods that it would be of great value to produce the stitch on knit goods.   This commercial suggestion led to an attempt to adapt the old machine to knit goods.   The difficulty in using the old machine on goods of this class is described by Metcalf, complainant's expert, who says that the cause of the trouble which the improvement described in the patent was intended to remedy was "the practical impossibility of making a soft yielding fabric like knit goods pull the requisite amount of thread down by the feeding movement against a tension sufficient for the other purposes of the stitch-forming operation."

It is important to note that, in both machines above referred to, "each feed movement of the cloth draws down from the needle-thread supply the amount of thread necessary to extend from the needle hole last made to the needle hole next to be made."   The thread-drawing movement, which secures a supply of thread to go through the material, may be disregarded in this case.   It is characteristic of these machines that the material acts in pulling off a thread supply against tension.   Leather was strong enough to do this, but when knit goods were introduced in the prior machine they yielded to the strain on the

thread, and the goods puckered. This was remedied by the obvious means of reducing the constant tension; the relation between feed and constant tension being so adjusted that the thin material could draw the thread without puckering. We are clearly of the opinion that no inventive work was done by Woodward until after the adoption of the manufacturer's suggestion, and after the attempt to use the old machine with a reduced tension. There was no novelty or invention in the adjustment of the constant tension to the strength of material in order to avoid puckering. When this was done, the movements of the cloth and of the feed were simultaneous, as in the old machine.

It was found, however, that the reduced tension, though it would avoid puckering and solve the feed difficulty, and the pull-off difficulty, led to new difficulties not encountered in the prior machine. Thus the shuttle, passing through the loop, would drag from the light constant tension a certain amount of thread not desired, and would leave a loose loop of waste thread underneath the goods; also it was found that the take-up, instead of drawing thread from the loop alone, would draw thread from the light constant tension. These defects were remedied by the addition of a new element to the old machine, namely, "automatic thread holding and releasing devices," and this is all there is in the claims in issue to distinguish them from the prior patent. By this element (using language from the fourth claim), "the needle thread is held while the shuttle is entering the needle loop, and released while the work is being moved by the work feeder, as set forth."

It will thus be seen that in the machine of the patent in suit the thread is subject to two tensions,—the light constant tension adjusted to and co-operating with the feed and pull-off, the heavier tension adjusted to the action of shuttle and take-up,—whereas, in the old machine, the thread was under a uniform tension adapted to the stitch-forming operations as well as to feed and pull-off. It will be observed, also, that a constant tension device is an element of the claims in issue. The specification, referring to the constant tension, states, "Only sufficient tension is required to cause the thread to lie smoothly on the surface of the work." The prior art discloses the use, in straight-seam sewing machines, of two tensions, whereby, through an intermittent check, a light tension is imposed when thread is drawn from the supply, and a heavier tension at other times.

In the patent to Tripp, 282,410, 1883, is shown an intermittent tension. The specification states also, "especially when sewing fine or fancy goods, what is commonly known as 'puckering' is avoided by reason of the thread being rigidly held during the passage of the shuttle, and released subsequently to the proper normal tension for the thinnest goods." Other references are Cowperthwaite, No. 13,630; Whitehill, No. 184,938; Macy & Hobbs, No. 40,000; Willcox & Carleton, No. 116,521; Barton & Willcox, No. 255,581; Blodgett & Lerow, reissue No. 188; Willcox, No. 43,819. In the prior art is also the universally movable work holder or feed, shown in patents to St. Amant, No. 145,025; Cornely, No. 148,182; Cushman, Nos. 165,798 and 167,-747; and House, No. 206,239.

The intermittent tension and universally movable work holder or feed are not found combined in any previous machine. The complainant, however, is precluded by the prior art and the character of the claims, as well as by the concessions of its expert, from claiming broadly this combination, and we think it apparent that the relation between intermittent tension and stitch-forming operations might well be the same in a machine with a universal feed and in one with a straight feed.

Mr. Metcalf states "that the opening and shutting of an intermittent tension was a well-known means of varying the resistance opposed to the drawing down of thread, and that, therefore, the novelty of the mode of operation under consideration must be determined by the operative relation between the thread holding and releasing devices as a whole and the feed device as a whole." He says, also, that "the material thing is the presence and the timing of this reduction of resistance, and not the kind of mechanism used for effecting it," and that the holding and releasing mechanism is so timed relatively to the feed as to enable the feed to draw down needle thread against a less resistance than that which operates at certain other parts of the process.

Counsel for the complainant insists upon the novelty in the timing of the operation of feed and intermittent tension, and says: "The essential thing is that the needle thread is and must be gripped and held during the setting of the stitch and released during the feed." One reason for this is that the feed and pull-off are simultaneous. We may describe the timing of the action of the intermittent check by saying that it holds the thread during the setting of the stitch, and releases it during the action of the pull-off. This description fits both the complainant's device and the devices of the prior art, and is old. Or we may describe the timing by saying that the check holds the thread during the setting of the stitch, and releases it during the feed. These words are applicable, but they imply an entirely fallacious view of the inventor's problem. As a matter of fact, the relation of tension and feed necessary to prevent puckering is a relation of constant tension and feed. A light, uniform, constant tension, that would lay the thread smoothly upon the material, was adopted. This done, the material would feed properly, and this, we have already said, preceded any inventive act. There remained, then, only the difficulties which arose from the adoption of this obvious mechanical expedient of a lighter tension for feed and pull-off. These were difficulties of the stitch-forming operation, and were solved precisely as in the prior art by an intermittent check to hold the thread during the action of shuttle and take-up. To retain this heavy tension after it had done its required work would have interfered directly with what had been done to relieve the material in the thread-drawing function. To have kept it on longer would have been an absurdity; and the contention that there was inventive thought in releasing the heavy tension to the feed amounts merely to a claim that there was invention in not doing an absurd thing absolutely inconsistent with the prior art of reducing the constant tension. The inventor's view is stated by him as follows:

"When I had a tension light enough so that the goods could be carried without puckering them or drawing them together, I had no means, with the present devices for the take-up, of drawing back the loop which the shuttle made to pass the shuttle thread through. * * * I then had to experiment to find out some means whereby an extra tension or a lock on the supply thread, while the take-up was operating, would assure the loop to be drawn back instead of drawing from the supply end. After that it was only a question of running sufficient light tension that the goods could be carried along without puckering, and at the same time laying a silk thread or floss straight upon the goods."

His experiments were subordinate to the main requirement of a light constant tension. The constructor's thought was to run under a light tension, except during the stitch-forming operation. Mr. Metcalf says, in effect, that it was to time the release of a heavy tension to the feed movement. This seems an inverted and fallacious way of expressing what was done by Woodward. We may say, of course, that the machine works under a light tension, increased during the stitch-forming operation, or that it works under a heavy tension, released during the thread-drawing operation. These may be regarded as equivalent expressions for the same thing, and this thing was old. Mr. Metcalf employs, however, the word "feed" instead of "thread-drawing operation"; insisting upon the importance of the relation between the feed and the release of the heavy tension, and asserting that this is novel.

The word "feed" admits of some ambiguity. The "feed mechanism" is a part of the machine, which clamps and controls the material. The material, when so clamped, partakes of the movements of the feed mechanism. The material may thus be considered a part of the feed. The feed mechanism operates in the machine of the patent in suit exactly as in the Woodward & Keith machine. This feed mechanism was capable of acting against a heavy tension sufficient for the stitch-forming operations. A light tension was required only for the free movement of the cloth. The continuance of a heavy strain sufficient to set the stitch would therefore not interfere with the movement of the feed mechanism. Therefore, were the intermittent tension not released during this movement, the new machine would operate substantially as the old. The release of the heavy tension, therefore, is related to the material, and not to the feed mechanism, and is simply in order that the material may proceed under that light constant tension which is found necessary to prevent puckering and to lay the stitches smooth. But, as we have said, all this was involved in the adjustment of constant tension to feed of the cloth. The release of the heavy tension at the time of the movement of the cloth was therefore nothing more or less than adopting what Mr. Metcalf calls "well-known means of varying the resistance opposed to the drawing down of thread." In other words, there is no new relation between the release of intermittent tension and the object to be effected thereby. We are therefore of the opinion that, if the claims are of any validity, they, in any event, cannot be given the breadth of construction for which the complainant contends, but must be restricted to the precise construction described in the patent.

Upon the question of infringement, it might therefore be sufficient

to say that the defendant does not have a constant tension adjusted to the thread-drawing capacity of the cloth, and sufficient to cause the thread to lie smoothly on the surface of the work, nor automatic thread holding and releasing devices, released while the work is being moved by the work feeder, as described in the patent in suit. We are of the opinion, however, that the defendant has clearly shown distinct mechanical differences between its machine and that of the complainant, which satisfy us that the constructor of the defendant's machine is entitled to credit for solving the difficulties of adapting the Woodward & Keith machine, or a machine of that class, to knit goods, without copying from the complainant.

Whether the commercial suggestion that knit goods with the Woodward & Keith stitches would find a market was derived from the complainant is immaterial. This idea was not the complainant's, and cannot be monopolized. In remedying the defects of the old machine applied to the new fabric, the defendant's constructor, instead of following the plan of Woodward, to draw down the thread by the cloth, took the pull-off function from the cloth, and gave it to the take-ups, which, by a positive movement, drew off the amount of thread required for the new stitch. This relieved entirely the difficulty that arose from the former thread-drawing function of the cloth. This thread positively drawn was given up as slack thread to the feed. In adopting a positively operated pull-off, the constructor was nearer to the devices of Barton & Willcox and Whitchill than to anything suggested by the complainant's patent. Instead of laying the thread smooth upon the work under the constant tension of the complainant, the defendant's machine has slack thread, under no constant tension at the time of feed. There is no co-operation of constant tension and feed, as in the complainant's device. The undercheck of the defendant, whereby strain is taken from the work while the shuttle is passing through the loop, has no counterpart in complainant's machine. Without referring to other matters of defense, we are satisfied that, in respect to the matters in issue, the defendant's machine is a mechanical organization built upon a plan entirely different from that of the complainant's machine, and that there is no infringement. The decree of the circuit court is reversed, and the case is remanded to that court, with directions to dismiss the bill, with costs, and the costs of appeal are awarded to the appellant.