## CITY OF OWENSBORO v. CUMBERLAND TELEPHONE & TELE-GRAPH CO.

(Circuit Court of Appeals, Sixth Circuit. December 14, 1909.)

No. 1,942.

1. COURTS (§ 407*)—FEDERAL COURTS—CIRCUIT COURTS OF APPEAL—PROCEDURE ON APPEAL FROM ORDER GRANTING INJUNCTION.

   On an appeal to the Circuit Court of Appeals from an interlocutory order granting a preliminary injunction, the court will not ordinarily go into the merits of the case further than necessary to determine whether the court below had jurisdiction, and, if so, whether it exceeded a reasonable discretion in making the order, although if the record plainly exhibits the whole case, and the court is able without injustice to finally determine the entire merits of the case, it may do so.

   [Ed. Note.—For other cases, see Courts, Dec. Dig. § 407.*]

2. COURTS (§ 282*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION.

   Under the federal Constitution, a municipal corporation, although having power to regulate the rates to be charged by a telephone company, may not reduce such rates below a rate which will pay operating expenses, maintain the plant, and pay a fair return on the capital actually invested, and a bill to restrain the enforcement of a rate alleged to be confiscatory presents a federal question and is within the jurisdiction of a federal court.

   [Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820–824; Dec. Dig. § 282.*

   Jurisdiction in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purch. Co. v. Boston & M. C. C. & S. Min. Co., 35 C. C. A. 7.]

3. MUNICIPAL CORPORATIONS (§§ 680, 681*)—CONSTITUTIONAL LAW (§ 134*)—REGULATION OF STREETS—POWER TO GRANT RIGHTS TO TELEPHONE COMPANY—"REGULATE"—"CONTROL."

   Under the law of Kentucky (Acts 1881–82, p. 817, c. 461), which holds that the use of a street by a telephone company is for a public and not a private purpose, general power expressly given to a city by a special charter to "regulate" the streets, alleys, etc., imports power to control their use, the word "regulate" being a word of wider import than "con-

trol," and authorizes the city to grant the right to a telephone company to erect and maintain its poles in the streets, and such a grant in the nature of a contract, made before the adoption of the state Constitution of 1891, under which the company proceeded to build and operate its lines and exchange at a large expense, is not affected by such Constitution under the proviso of section 163.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1463; Dec. Dig. §§ 680, 681;* Constitutional Law, Cent. Dig. § 344; Dec. Dig. § 134.*

For other definitions, see Words and Phrases, vol. 7, pp. 6041–6047; vol. 8, p. 7782; vol. 2, pp. 1549–1552; vol. 8, p. 7617.

Rights of telegraph and telephone companies to use of streets, see note to Southern Bell Tel. & Tel. Co. v. City of Richmond, 44 C. C. A. 155.]

Appeal from the Circuit Court of the United States for the Western District of Kentucky.

Suit in equity by the Cumberland Telephone & Telegraph Company against the City of Owensboro. Defendant appeals from an order granting a preliminary injunction. Affirmed.

The following is the opinion of Evans, District Judge:

The complainant was incorporated in 1883 under the laws of Kentucky, and by its charter was authorized to carry on a telephone business. It has established a system which extends over several states, including Kentucky. In the latter it has its principal place of business, and, besides those in Louisville and other places, it has an exchange in Owensboro. Radiating therefrom it has lines in many directions which reach nearby towns, as well as those in other states, and by which each of its patrons in Owensboro and others there who desire to use its lines can reach any one of its 160,000 subscribers. On December 4, 1889, the common council of Owensboro, the legislative body of the city, enacted an ordinance as follows:

"The following ordinance, after being twice read, was enacted by the following vote, to wit: Ayes, Mes. Borer, Brotherton, Vargeson, Cullon, Higdon, Decker, noes, none, viz.:

"Be it ordained by the mayor and common council of Owensboro, Ky.:

"That the Cumberland Telephone Company, its successors and assigns, is authorized and hereby granted the right to erect and maintain upon the public streets and alleys of said city any number of telephone poles of proper size, straight and shaved smooth, set plumb and set erect, and any number of wires thereon with the right to connect such wires with the building when telephone stations are established, provided that such poles shall be located and kept so as not to interfere with the travel upon said streets or alleys or the substantial use thereof by the inhabitants of said city.

"Sec. 2. That the said Cumberland Telephone Company shall erect only one line of poles on a street, except for the length of one block upon the street upon which the exchange building may be located, and where the wires of said company enter such exchange building, the said company shall have the right to erect and maintain its poles on both sides of such street and the lowest wire of said telephone company shall not be less than twenty-five feet from the ground, except where such wires enter the exchange building or telephone stations.

"Nothing in this ordinance contained shall be construed as an exclusive right to said company to erect and maintain said poles upon the streets and alleys of said city, and no obstruction shall be placed by said company to the erection and maintenance of poles by any other person or company. Such company shall enjoy such rights in common with all other persons or companies to whom said city may see proper to extend the same right.

"Sec. 3. The said telephone company shall repair all streets and alleys it may enter upon and use for the purpose herein provided, which by the acts of

---

said company or persons in its employ shall have become injured or damaged or been made unsafe. All proper precautions and safeguards shall be used to prevent such use from becoming either injurious or annoying to the inhabitants of said city, and should any damage or injury result to any person or property by reason of the erection and maintenance of such poles, or the failure to keep the streets and alleys in repair as herein required, and said city shall be held liable by reason thereof, such company shall pay all damages and costs resulting therefrom to the parties injured, or to the city, if paid by her.

"Sec. 4. The rights and privileges herein granted to said telephone company are upon the terms and conditions following, viz.: That said company shall furnish free of charge one telephone for each engine or hose house, now erected or which may hereafter be erected by said city, one for police headquarters and one for the mayor's office, making at this time only two such telephones to be furnished by said company for the use of the city, shall be kept in good order for constant use by said company. Said company shall also allow the city the exclusive use of two feet of one arm on each pole for its fire alarm telegraph. The fire alarm telegraph poles of the city may be used by said company for its wires, provided such wires be kept two feet from the said fire alarm telegraph wires, and such poles used by said telephone company shall be replaced by it when needed.

"Sec. 5. All poles of said telephone company shall be set close to the inner side of the sidewalk curbing.

"Sec. 6. This ordinance may be altered or amended as the necessities of the city may demand.

"This ordinance shall be in force from and after its passage."

The complainant promptly constructed its exchange and put up its wires in the city at great expense, and has for nearly 20 years maintained and operated its business in Owensboro. The city placed its fire alarm wires on complainant's poles, and the complainant installed telephones in the various city offices, as provided for in the ordinance, and the situation has remained thus for many years. In August, 1908, the common council of Owensboro, with the approval of the mayor, enacted another ordinance in the following language:

"An ordinance regulating the charges for telephone service in the city of Owensboro:

"Whereas, there has been irregularities in charges made by corporations or companies furnishing telephone service in the city of Owensboro, by which persons are often charged higher prices than others for the same service, and in the same locality; and, whereas, such prices are often exorbitant or unreasonable: Now, therefore, in order to regulate the same by establishing a uniform system of reasonable charge for said service, be it ordained by the common council of the city of Owensboro:

"Section 1. That all companies, corporations, firms, or individuals, who are now operating, conducting and maintaining a telephone system in the city of Owensboro, and all companies, corporations, firms or individuals who shall hereafter maintain, operate or conduct a telephone system or service in the city of Owensboro, shall regulate the prices or charge for such service as hereinafter provided.

"Sec. 2. For each telephone in a business house or office, the charge or price shall not exceed two dollars and fifty cents ($2.50) per month, or at the rate of thirty ($30.00) dollars per year; for each telephone in a residence, the charge or price therefor shall not exceed one dollar and fifty cents ($1.50) per month, or at the rate of eighteen dollars ($18.00) per year; for extension desk telephone, the price or charge therefor shall not exceed one dollar ($1.00) per month, or at the rate of twelve dollars ($12.00) per year, in addition to the regular prices herein before specified.

"Sec. 3. It shall be unlawful for any corporation, company, firm or individual, furnishing telephone service within the city of Owensboro, to charge therefor an amount exceeding that fixed in this ordinance, and any violation hereof shall be punished by a fine of not less than ten dollars ($10.00), nor more than one hundred dollars ($100.00); and each charge in excess of the amount so fixed shall constitute a separate offense.

"Sec. 4. All ordinances or parts of ordinances in conflict herewith are hereby repealed.

"Sec. 5. This ordinance shall take effect from and after its passage."

The operation of this ordinance was suspended from time to time until January 1, 1909, when it became effective.

By its bill the complainant insists that the rates thus fixed and provided for by the city are unjust, and that their enforcement would confiscate its property in Owensboro for the use of the people of that city and would require the complainant to operate its lines and use its property in Owensboro for the benefit of the local public and not to any' great extent for the benefit or profit of complainant or its stockholders, who expended the money necessary to erect, install, and operate telephone facilities there, all in violation of complainant's rights under the Constitution of the United States.

The complainant, upon the showing made by the bill, asked, and the court granted, a temporary restraining order forbidding the carrying into effect of the ordinance pending the hearing and determination of complainant's motion then made for an injunction pendente lite. The questions arising upon this motion were ably argued, as was, at the same time, the questions arising upon the demurrer of the defendant to the bill of complaint. The demurrer was based upon two grounds: First, that the bill was multifarious; and, second, that there was no equity in the bill. Some days ago the court sustained the demurrer upon the ground that the bill was multifarious, and gave the complainant leave to amend it, if so desiring, by electing which of the several causes of action covered by the bill complainant would prosecute in this suit, and by an amendment it elected to proceed upon its cause of action arising upon the ordinance we have copied, and thereupon so much of the bill as sought relief against another ordinance referred to therein, relating to the removal of complainant's poles from the streets of Owensboro, was stricken out. The ground of demurrer to the bill as it now stands is want of equity, and without discussing the matter in detail the court contents itself with saying that, if the averments of the bill are true, there is, in the opinion of the court, equity therein, and the demurrer will be overruled.

Whether the injunction pendente lite should be granted will depend upon whether the rates of charges established by the ordinance are shown in this hearing to be "plainly unreasonable to the extent that their enforcement would be equivalent to the taking of property for public use without such compensation as under the circumstances is just to the owner and the public." We have quoted the language of Mr. Justice Peckham in the opinion of the Supreme Court in Willcox v. Consolidated Gas Co. (delivered January 4, 1909) 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, as it authoritatively and clearly states the rule to be applied in this case.

As one factor in the problem, we ascertain and determine that the complainant is entitled to earn for its stockholders as much as 6 per cent. per annum net upon the fair value of its plant or upon the money actually invested therein at Owensboro, after taking into account the operating expenses and the various other items held in the case referred to to be appropriate in making the calculation.

At the hearing the sworn bill of complaint, read as an affidavit, was all the testimony offered by the complainant, and the defendant offered no testimony in contradiction of its statements. This omission is significant of defendant's inability to make a contrary showing, as it had ample time for preparation. Among the statements of the bill were the following:

"That on July 1, 1908, and likewise at the present time, your orator has expended largely in excess of $100,000.00 in the construction of said exchange, and your orator charges that it could not be reproduced for a less amount at the present time, and that it has been built economically, prudently, and skillfully.

"Your orator charges that its operations in the city of Owensboro have almost from the beginning been disastrous, so that it has not in the aggregate earned as much as 1 per cent. upon the actual cost of its property in said city, nor has it during any one year since it has been operating said plant earned as much as 5 per cent. net upon the actual cost or value of its said plant.

"During the past year, to wit, 1908, it received the following revenue:

| | |
|---|---:|
| Exchange service | $25,990 50 |
| Proportion of tolls earned by exchange | 1,403 26 |
| Messenger | 235 20 |
| Miscellaneous | 22 85 |
| List ads | 273 75 |
| | $27,925 56 |

—and during the same year it paid out in expenses the following:

**General:**

| | |
|---|---:|
| Salaries and wages | $ 815 39 |
| Rent, light and heat | 40 14 |
| Traveling | 146 84 |
| Postage, ptg. and sta | 6 80 |
| Legal | 1,050 70 |
| Uncollectible | 168 92 |
| Incidental | 213 44 |
| | $ 3,704 06 |

**Operating:**

| | |
|---|---:|
| Salaries and wagons | $ 8,238 68 |
| Rent, light and heat | 971 65 |
| Postage, ptg. and sta | 104 80 |
| Directory | 312 90 |
| Advertising and canvassing | 245 90 |
| Messenger expense | 202 85 |
| Incidental | 311 84 |
| | $10,388 67 |

**Maintenance:**

| | |
|---|---:|
| Salaries and wages | $ 4,995 33 |
| Rent, Light and heat | 390 83 |
| Material | 943 88 |
| Traveling | 1,335 54 |
| Incidental | 790 66 |
| Damage and compensation | 60 66 |
| | $ 8,516 90 |
| Instrument rental | $ 1,225 83 |
| Insurance | 261 10 |
| Taxes | 1,617 16 |
| Total | $24,487 89 |

"Your orator further states that the foregoing is the exact amount of money received from the operation of said exchange and the exact amount of money paid out by it in expenses in conducting said exchange; and nothing whatever is allowed therein for depreciation of its property, which your orator charges should be 7½ per cent. upon the actual cost of the property, less whatever amount was used during the year in reconstructing any part of the plant. From which it appears that your orator has a balance of $3,437.67 of revenue above the actual amount paid out by it, and if a fair amount for depreciation be added to the expenses, it will more than consume this balance of revenue. So that your orator charges, and it is a fact, that your orator, on its present schedule of rates, is unable to earn any return whatever upon the actual cost of its plant in the city of Owensboro, Ky."

We find that the actual cost of the complainant's plant in Owensboro exceeded $100,000, but, as the bill does not indicate the amount of such excess, we find the present reasonable value of the plant to be at least $100,000. Upon this sum 6 per cent., of course, would be $6,000, and we think plaintiff would be entitled, if it can do so, to earn that much per annum for its stockholders over and above expenses of operation, or, at all events, it should not be prevented from doing so by the imposition by the city of rates which would make it impossible. Instead of approximately 6 per cent., its earnings have

always been much less, and during the entire year 1908 its earnings at Owensboro were only $3,437.67, or a trifle over 3.4 per cent. (instead of 6 per cent.) on $100,000, and this without taking into account anything for the constantly occurring depreciation. This result was achieved when the local rates charged varied from $3.75 to $2.50 per month for business telephones, and from $2 to $1.50 per month for residence telephones; in each respect the different rate being dependent upon the character of equipment and service desired by the patrons. Upon their face these rates appear low, but, as we have seen, the ordinance provided that the local telephone rate for a business house or office should not exceed $2.50 per month, and that the rate for a telephone in a residence should not exceed $1.50 per month, and it is manifest that those rates would be lower by about one-third than those of complainant, and equally clear upon all reasonable hypotheses that the complainant's net earnings would be lessened in about the same ratio, which would reduce complainant's net annual earnings to about 2½ per cent. upon $100,000, and this, manifestly, is not "a fair return upon the reasonable value of the property at the time it is being used by the public," to quote further from the opinion of the Supreme Court. This does not seem to be a problematical or speculative result, but one which, under the operation of normal conditions, would be inevitable. Under such a state of case we do not suppose that it would be just or equitable to require that the matter should be first tested by putting the lower rates into operation for the purpose of ascertaining a result by actual trial. The only result of such a course would obviously be to inflict an irreparable injury upon the complainant, for certainly, when the experiment only made clearer what was already sufficiently clear, the loss would fall altogether upon the complainant, and could not be recouped from its patrons, as it could not hope to collect a higher rate for the time consumed in the trial of the ordinance rates. If the net earnings of the complainant under its own rates had been shown to be approximately but nevertheless below 6 per cent. per annum, it would have been our duty to refuse an injunction until the ordinance rates had been tried for a reasonable period; but the case as presented is too plain to make that course necessary or even proper. Upon the whole, we think it entirely clear from complainant's showing that the rates fixed by the legislative body of Owensboro are confiscatory, and do not permit a "fair return" upon complainant's investment, nor upon the reasonable value of its property now in use for this public utility.

It was argued that the complainant had not in any way acquired a franchise from the city, as required by section 163 of the Constitution of Kentucky. However important or difficult the questions growing out of that provision might be, we do not see how they arise or are presented upon the bill as amended, which does not refer to it. As we have seen, the complainant was organized under the laws of Kentucky, and authorized to do a telephone business in this state. The common council of Owensboro, having control of the streets, passed, in 1889, the ordinance we have copied, giving the telephone company the rights therein set forth under which to construct and install at its own expense a most important public utility. These rights, after large expenditures upon the faith of the ordinance, have been exercised, and the city has used the wires for its fire alarm, and has been supplied with free telephones in its public offices for nearly 20 years, and we will presume, for the purpose of this motion, that there was granted therefor a sufficient license and franchise, as nothing is shown by the record to the contrary, and in the determination of the pending motion we will lay entirely to one side all questions which may be supposed to arise under section 163 of the state Constitution. Especially must this result follow at this hearing because we cannot find that any question upon section 163 of the state Constitution and its requirements is raised by any averment of the bill as amended. It seems to the court that in more than one respect the demurrer introduces a statement of fact not found in the bill of complaint. It is therefore, to that extent, a speaking demurrer, and is condemned alike by text-writers like Daniell and Story and by the courts. Stewart v. Masterson, 131 U. S. 158, 9 Sup. Ct. 682, 33 L. Ed. 114. Such matters can be properly presented only by plea or answer.

We may sum the matter up by adding that, on the day the case of Willcox v. Consolidated Gas Co. was decided, the Supreme Court also decided the case

of Mayor, etc., of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. The opinions in the two cases clearly hold: First, that where there is any doubt as to whether the rates fixed by legislation are confiscatory an injunction should not be granted; second, that unless the previous history of the company's operations satisfactorily shows that the new rates will inevitably be confiscatory, they ought to be put into operation and given a fair trial before condemning them; though, third, this is not necessary nor proper where the facts are such as to show clearly that the new rates must inevitably be confiscatory as giving no chance for obtaining a fair return upon the value of the investment at the time the new rates shall be put into effect.

Whatever may be shown when the issues in this case shall have been made up and the facts fully developed from the standpoint of both sides to the controversy we cannot, of course, say; but the uncontradicted facts here are: That in nearly 20 years' experience the company's rates have yielded small but varying profits; that last year (which, we think, may fairly be regarded as typical) they yielded only 3.4 per cent. net; and that the reduction, which would obviously leave the rates at only two-thirds of what they previously were, could not produce a net revenue of anything approximating 6 per cent. per annum.

As the present motion is for a temporary injunction only to operate pending a full investigation, we think, prima facie, that the case is sufficiently made out to entitle the complainant to that much relief.

Another observation may probably not be inappropriate. Contentions over telephone rates come up after the expenditure of large sums of money by those who install the system while inducements for such expenditures are held out. That system increases its usefulness to the public in proportion to the increase in the number of subscribers whom it serves. The greater the number of the latter, the greater the chance that contentions will come up—there being then a greater variety of people to make complaints—and the more accustomed they become to the use of this modern but necessary public utility, the more pressing appears to be the demand for cheapness, with some tendency also to forget that those who had put up the money and pioneered the venture are entitled at least to a fair return upon the sums invested. The courts should not overlook the latter aspect of the case, while always aiding municipalities in their efforts to prevent extortionate or unreasonable rates or other abuses by telephone companies. Furthermore, if the complainant be refused an injunction pendente lite, it cannot take an appeal from that refusal, while the defendant may at once appeal if the motion for the injunction is sustained. All these matters have been taken into consideration as possibly entitled to exert some influence upon the court in the exercise of any discretion it may have in respect to granting or refusing an injunction at the outset of the litigation.

Upon the ground that the action of the city of Owensboro would obviously be confiscatory in its effects, the motion for an injunction pendente lite is sustained.

R. W. Slack, City Atty., and George W. Jolly, for appellant.
Wm. L. Granbery and Fairleigh, Straus & Fairleigh, for appellee.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

LURTON, Circuit Judge. This is an appeal from an interlocutory order enjoining the city of Owensboro from putting in force, pending a final hearing, an ordinance of the common council of that city passed in August, 1908, regulating the charges for telephone service in that city.

The bill is filed by the Cumberland Telephone & Telegraph Company, a corporation created by the state of Kentucky for the purpose of engaging in the construction, maintenance, and operation of telephone and telegraph lines, which company has engaged in that busi-

ness for more than 25 years, and is now maintaining and operating an extensive telephone system covering the state of Kentucky and many other states. It is averred that at this time it owns and operates more than 500 telephone exchanges, one of which is in the city of Owensboro, and that by the aid of long distance toll lines these exchanges are connected one with another, scattered over seven states. Its capital invested in the business is said to exceed $20,000,000, and that its Owensboro exchange absorbs a capital of more than $100,000. The Owensboro wires are carried upon poles placed in the streets and alleys of the city which center in the Owensboro exchange in the well-known way in which such business is carried on. The long distance wires connecting its more than 500 exchanges are carried upon the poles which support and carry the lines running from the local Owensboro exchange to its Owensboro subscribers.

Its Owensboro plant was constructed under an ordinance passed by the common council of that city on December 4, 1889, and has ever since that time been maintained and operated under the terms of that legislation. It is unnecessary to set out its provisions. It is enough to say that the privilege of erecting its poles upon the streets and alleys and maintaining thereon its wires is specifically granted, subject to particular regulations therein set out in respect to location, number, and character of the poles, and repair of the streets injured or made unsafe by construction work. The rights thus granted were upon the following conditions and terms, namely:

"That said company shall furnish free of charge one telephone for each engine or hose house, now erected or which may hereafter be erected by said city, one for police headquarters and one for the mayor's office, making at this time only two such telephones to be furnished by said company for the use of the city, shall be kept in good order for constant use by said company.

"Said company shall also allow the city exclusive use of two feet of one arm on each pole for its fire alarm telegraph. The fire alarm telegraph poles of the city may be used by said company for its wires, provided such wires be kept two feet from the said fire alarm telegraph wires, and such poles used by said telephone company shall be replaced by it when needed."

It was further provided that the rights thus granted should not be exclusive, but enjoyed in common with others to whom the city might grant like rights.

The bill averred that the city has continuously enjoyed the rights and privileges for which it contracted, and has erected and maintained its fire alarm wires upon the poles of the company, and has received the benefit of free telephone service in its various city offices as provided by the ordinance.

The question in the case turns, not upon the power of the city, through ordinance duly enacted, to regulate the schedule of rates for service within the city, but upon the reasonableness of the rates prescribed.

The bill avers that the rates in force when this regulating ordinance was enacted ranged from $2.50 per month to $3.75 for a business telephone, depending upon the character of equipment and service which the customer required, and that its residence rates ranged from $1.50 to $2 per month. The regulating ordinance limits the rate for a busi-

ness telephone to a maximum of $2.50 per month, and for a residence telephone to $1.50 per month. It is then provided that a rate in excess shall constitute a misdemeanor, punishable by fine of not less than $10 nor more than $100, and that "each charge in excess of the amount so fixed shall constitute a separate offense."

The bill avers that the Owensboro Telephone Exchange has involved an expenditure of more than $100,000, and that it was economically constructed and has been likewise economically operated; but that it has not, taking the entire life of the business, earned more than 1 per cent. per annum, net, upon the capital invested, and that even in the later and larger period of its business it has never in any one year earned as much as 5 per cent. To support this the bill sets out the income and expenditures for 1908, showing a net revenue over expenses of $3,137.67.

It is then charged that the rates fixed by the rate ordinance are "unreasonable, unjust, unfair, and confiscatory"; that if enforced they will deprive orator of its property without due process of law and will take its property for public use without just compensation in violation of the Constitution of the United States.

It is further charged that the ordinance of 1889, under which it entered upon and constructed its poles and wires upon and along the streets of the city, upon the terms, conditions, and considerations named therein, constitutes a contract; and that the ordinance of 1908, in so far as it prescribes unreasonable and confiscatory rates for service, impairs the obligation of the contract.

The only questions which arise under the special or limited appeal from an interlocutory decree granting a preliminary injunction are those which are necessarily involved by the allowance of the injunction pendente lite. If the court below had jurisdiction and did not unreasonably exercise its discretion in the granting of an injunction to preserve the status until a final hearing, this court will not ordinarily go into the merits of the case any farther than necessary to determine this question. Duplex Printing Press Co. v. Campbell Printing Press Co., 69 Fed. 250, 16 C. C. A. 220; Loew Filter Company v. German American Filter Co., 107 Fed. 949, 47 C. C. A. 94. Nevertheless, if the transcript plainly exhibits the whole case, and the court is able, without injustice, to finally determine the entire merits of the case, it may do so. Goshen Sweeper Co. v. Bissell Carpet-Sweeper Co., 72 Fed. 67, 19 C. C. A. 13; Smith v. Vulcan Iron Works, 165 U. S. 518, 523, 17 Sup. Ct. 407, 41 L. Ed. 810.

In the present case the propriety of any injunction depends necessarily upon the jurisdiction of the court in the first instance, and, in the second, upon the merits of the case as the merits appear upon the face of the bill.

The jurisdiction of the Circuit Court depended upon the presence of a federal question. That is clear enough. Assuming the power of the municipality to regulate the schedule of rates to be charged for the service of public service corporations, it is plain that the rates of such a company may not be reduced to a point below a rate which will pay operating expenses, maintain the plant, and return a fair profit upon the capital actually invested. See: San Diego Land Company v.

National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154; Willcox v. Consolidated Gas Company, 212 U. S. 19, 41, 29 Sup. Ct. 192, 53 L. Ed. 382.

Coming, then, to the question as to whether the learned circuit judge exceeded a reasonable discretion in awarding an injunction pendente lite:

It is first said that the court should not interfere with rate legislation before it goes into effect, except in clear cases, and that the court should in this instance have let the rate go into effect and be tried, or required the charges above the ordinance rates to be paid into court to abide the final result. City of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382.

The averments of this bill are quite specific as to the revenue, cost of maintenance and operation, and as to the capital invested in the particular exchange involved. We are not, upon such an appeal as this, satisfied that the court below exceeded its fair duty and power or violated the spirit of the cases cited in allowing an injunction upon the strong averments of this bill, although we should have been better content if it had required the excess collected over the rates prescribed to be paid into court to await a final decree.

But counsel say that the charter of the city of Owensboro, under which its government was conducted when the street rights of the Cumberland Telephone Company were granted, is a public law of which this court must take notice, and that neither under the power granted therein, nor under the general law of the state, did the city of Owensboro have power to permit telephone poles to be placed in or along its streets, nor to allow the stringing of wires upon poles so placed, and that the ordinance of December 4, 1889, is therefore void as in excess of power. From this premise it is urged that, if the telephone company has no valid street easement, it is a trespasser, and cannot therefore object to the rate ordinance, even if the rates are so confiscatory as to prohibit the carrying on of its business. This claim comes with bad grace, in view of the conceded fact that this company has for 20 years conducted its business, supplied the city with free telephone service, and carried the city's fire alarm wires upon its poles with at least the acquiescence of the appellant. The harshness of the claim is all the more evident, and the inconsistency only the more apparent, when such a position is taken in defense of an ordinance which is professedly one to regulate the charges of a company now said to have no right to complain of the unreasonableness of the rates fixed, because it has no rights which need be regarded in making rates. For this position, counsel cite Rural Home Telephone Co. v. Kentucky & Indiana Tel. Co., 128 Ky. 209, 107 S. W. 787, 32 Ky. Law Rep. 1068, and Frankfort Telephone Company v. City of Frankfort, 125 Ky. 59, 65, 100 S. W. 310. But both of these cases are based upon sections 163 and 164 of the Kentucky Constitution of 1891. That Constitution provides that no street easement may be granted to public service companies by any municipal corporation save for a limited time and after advertisement to the highest bidder. Those cases were in relation to street rights acquired after that Constitution went into ef-

fect, and in plain violation of the organic law of the state. The rights of the appellee were acquired before that Constitution by an ordinance, contractual in character, passed by the city of Owensboro when governed by a special charter granted in 1882.

Aside from any question as to the violation of the obligation of a contract, if an ex post facto effect should be claimed for sections 163 and 164 of the Constitution of 1891, it is specifically provided by section 163 that its provisions shall have no effect upon franchises theretofore granted when work had been in good faith begun thereunder. See L. & N. R. Co. v. Bowling Green, 110 Ky. 788, 63 S. W. 4, 23 Ky. Law Rep. 273, and City v. Louisville Water Company, 105 Ky. 754, 49 S. W. 766.

But it is said that neither the general law of the state nor the special charter under which the city was then operating delegated to the city the power to permit the streets of the city to be occupied by the poles and wires of a telephone company.

It may be conceded that neither a telegraph nor a telephone company can lawfully occupy the streets or alleys of a town without direct legislative authority, or by municipal consent in pursuance of powers delegated by the state. Morristown v. East Tennessee Telephone Company, 115 Fed. 304, 305, 53 C. C. A. 132.

That both the municipality and the telephone company supposed that the city had the authority under its charter powers to permit the establishment of poles and the stringing of wires along its streets and alleys is clear from the exercise of the power by the mayor and common council and the action which the telephone company took under this ordinance in entering upon and constructing a telephone system at a cost of more than $100,000.

That power to permit the use of highways and streets for such purposes must reside somewhere is obvious. Primarily, it resides in the Legislature of each state, but, as is well known, is almost universally delegated to the municipality concerned. Reasons of convenience, as well as theories of local rule in strictly local matters, lead us to expect that the local government has the power to regulate the use of its own streets.

Did the local government of Owensboro usurp the legislative functions of the state when it granted a street easement to the Cumberland Telephone & Telegraph Company? We think it did not.

The charter under which Owensboro was governed in 1889 was a special act of the Kentucky Legislature enacted in 1882. See Acts 1881–82, pp. 817–856, c. 461. It provides for a complete system of municipal government and includes no less than 120 sections, many of which are divided into subsections. Among the powers conferred by section 10 is that of "control of the finances and all property, real and personal, belonging to the city," and to enact ordinances for a large number of purposes later enumerated. Among the purposes for which it is given legislative power is "to regulate the streets, alleys and sidewalks, and all improvements and repairs thereof," etc. Unless this provision gave to the city the power to control its own streets by regulating the uses to which they might be put in the public interest, it was without any such power, aside from that which might be regarded as

inherent in a corporation created for the purposes of a municipal gov-
ernment. That such a corporation can exercise only those powers
which are either expressly granted or plainly implied from those so
granted, or essential to the declared purposes and objects of the cor-
poration, is well settled law. Detroit, etc., Ry. v. Detroit, 64 Fed.
628, 639, 12 C. C. A. 365, 26 L. R. A. 667.

But the use of a public street for the construction of poles to carry
the wires of such a company is a use within the range of the purposes
for which a street may be legitimately used, whether the fee be in
the city or its interest be confined to an easement in the land for street
purposes. This seems to be the settled rule in Kentucky. Cumberland
Telephone & Telegraph Company v. Avritt et al., 120 Ky. 34, 38, 85
S. W. 204. In the case just cited, the Kentucky court held that such
a use was for a public and not a private purpose, and that the ease-
ment of the public included such a method of use, and imposed there-
fore no new burden upon the owner of the fee in the street. If, then,
such a use is within the general objects and purposes to be served by
the power of opening and maintaining public streets, why is the grant
of a right to so use the public streets an act beyond the powers of the
municipal legislature? What power is delegated by the express power
to "regulate" the streets and alleys of the city? Manifestly, some-
thing was meant by the power to "regulate." The word "regulate"
imports the power to control the use of the streets, and is indeed a
word of wider import than "control" or the power to "consent" to an
easement of way.

In Detroit, etc., Ry. v. City of Detroit, 64 Fed. 628, 636, 12 C. C.
A. 365, 26 L. R. A. 667, this court held that if under the law of the
state of Michigan a street railway was but an improved mode of street
use, and therefore not an additional servitude which might be re-
strained by abutters, the general powers vested in the city of Detroit
to "prescribe, control and regulate" the manner in which the city
streets might be used was broad enough to permit the use of its
streets for such a purpose by a company having the requisite franchise
of a street railway from the state.

In section 575 of Dillon on Municipal Corporations, the author, after
stating that the usual powers of a general nature delegated to municipal
corporations are not sufficient to confer upon them the right to author-
ize the presence of commercial steam railways upon the streets, says:

"But it is otherwise as respects street railways; and the ordinary powers
of municipal corporations are usually ample enough, in the absence of express
legislation on the subject, to authorize them to permit or refuse to permit the
use of streets within their limits for such purposes."

In St. Louis v. Western Union Tel. Co., 149 U. S. 465, 469, 13 Sup.
Ct. 990, 992 (37 L. Ed. 810), the court, in discussing the power con-
ferred upon St. Louis over its streets, said:

"The word 'regulate' is one of broad import. It is the word used in the
federal Constitution to define the power of Congress over foreign and inter-
state commerce, and he who reads the many opinions of this court will per-
ceive how broad and comprehensive it has been held to be. If the city gives
a right to the use of the streets or public grounds, as it did by ordinance No.
11,604, it simply regulates the use when it prescribes the terms and conditions

upon which they shall be used. If it should see fit to construct an expensive boulevard in the city, and then limit the use to vehicles of a certain kind or exact a toll from all who use it, would that be other than a regulation of the use? And so it is only a matter of regulation of use when the city grants to the telegraph company the right to use exclusively a portion of the street. on condition of contributing something towards the expense it has been to in opening and improving the street."

So in 28 Cyc. p. 867, note 55, it is said:

"Under the power to 'regulate' the use of streets, municipal authorities may permit their use for railroad tracks, poles, wires, pipes, etc., of a public nature not inconsistent with the public uses to which the streets were dedicated. State v. St. Louis, 161 Mo. 371, 61 S. W. 658; State v. Murphy, 134 Mo. 548, 31 S. W. 784, 34 S. W. 51, 35 S. W. 1132, 34 L. R. A. 369, 56 Am. St. Rep. 515; Schopp v. St. Louis, 117 Mo. 131, 22 S. W. 898, 20 L. R. A. 783; Pikes Peak Power Co. v. Colorado Springs, 105 Fed. 1, 44 C. C. A. 333."

See, also, State v. Jacksonville R. Co., 29 Fla. 590, 10 South. 590.

Counsel for the appellants have cited East Tennessee Telephone Company v. City of Russellville, 106 Ky. 667, 51 S. W. 308, as supporting their claim that the general powers found in the charter of Owensboro are not sufficient to sustain the ordinance in question. The ordinance, there referred to as antedating the present Constitution of the state, granted an "exclusive" franchise. The court said of that exclusive franchise that:

"At that time the councilmen of the city had no legislative authority, express or implied, which authorized them to grant such a privilege to him."

The ordinance under which the Cumberland Telephone Company exercises its street easement expressly provides that the privilege shall not be exclusive. Furthermore, in the Russellville Case, had the ordinance been valid, Clark, to whom the privilege was granted, had not started work, in good faith, before the adoption of the new Constitution. Hence his easement was not saved by the proviso found in section 163. But aside from all this, it does not follow that because Russellville did not have power to grant a right or easement to a telephone company under its charter that Owensboro had not the power. The opinion does not show whether Russellville had the power to "regulate" its streets as Owensboro had.

The case of Louisville Railway v. City of Louisville, 8 Bush (Ky.) 415, is not in point. The only question in the case was whether the city might require a street railway company to remove its rails in order to allow the city to repave the street. The city railway was in the streets under an ordinance authorized by express legislative power. All that was said in reference to the insufficiency of a power to control and regulate, to support consent to occupation of streets by a street railway, was foreign to the case and not authoritative.

Other decisions of the Kentucky court cited have been examined. None of them made prior to the inception of the rights here involved concerned the interpretation of any such municipal power as is implied from the general power to "regulate" the use of streets, and none made since the rights of appellee arose are controlling upon this court in the exercise of its independent judgment in respect to rights which arose before such decisions.

Neither do we find it necessary to determine the duration of the franchise. All of the allegations of the original bill which related to an ordinance subsequent to the rate ordinance which directed the removal of poles and wires from the streets were stricken out. Whether the duration be presumed as for the life of the Cumberland Telephone Company, as seems to be the better rule (see Turnpike v. Illinois, 96 U. S. 63, 68, 24 L. Ed. 651, and Electric Light Company v. Wyandotte, 124 Mich. 43, 82 N. W. 821), or as in perpetuity, or as a mere revocable license, is for the purpose of the present appeal immaterial. It was not a trespasser when this rate ordinance was passed and may challenge its validity.

There was no error in the granting of the preliminary injunction, and the decree in that respect, is, accordingly, affirmed.