LOUISVILLE & N. R. CO. v. SILER et al.

(Circuit Court, E. D. Kentucky, at Frankfort. January 9, 1911.)

No. 686.

1. CONSTITUTIONAL LAW (§ 80*)—ENCROACHMENT ON JUDICIAL POWERS—STATE
   REGULATION OF RATES—VALIDITY OF KENTUCKY STATUTE.
      Act Ky. March 10, 1900 (Laws 1900, c. 2; Ky. St. § 820a; Russell's St.
   § 5358), known as the "McChord Act," which makes it the duty of the
   State Railroad Commission, on complaint thereof, to hear and determine
   whether a railroad company is exacting extortionate rates, and, if it
   so finds, to make and fix just and reasonable rates to be charged thereafter, does not confer judicial powers on the commission, in violation of
   sections 27, 28, 109, and 135 of the state Constitution, which provide for
   the distribution of the executive, legislative, and judicial powers of the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

state, designate the judicial tribunals, and forbid persons in one department from exercising any power belonging to either of the others, since the end to be attained by the hearing is the fixing of rates, which is legislative, and to which the determination of the reasonableness of existing rates is a necessary preliminary.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 143–147; Dec. Dig. § 80.*]

2. CONSTITUTIONAL LAW (§ 298*) — DUE PROCESS OF LAW — DEPRIVATION OF PROPERTY.

To entitle a railroad company to invoke the protection of the constitutional provision against the taking of property without due process of law against the enforcement of rates prescribed by a state, it must be shown that the rates are confiscatory, in that they do not yield the minimum reasonable return, as otherwise it will not be deprived of property by their enforcement, and what constitutes such reasonable minimum, as a judicial question, depends upon circumstances and locality, so that a general characterization of a rate as unreasonable is insufficient.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 847; Dec. Dig. § 298.*]

3. CONSTITUTIONAL LAW (§ 318*)—DUE PROCESS OF LAW--RIGHT OF REVIEW.

A statute authorizing a railroad commission to fix rates to be charged by a railroad company, which requires notice to the company and a hearing before the power can be exercised, is not unconstitutional, as depriving the company of its property without due process of law because it does not also provide for a judicial review of the order after it is made.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 949; Dec. Dig. § 318.*]

4. CONSTITUTIONAL LAW (§ 70*)—JUDICIAL POWERS—STATE REGULATION OF RATES--VALIDITY OF STATUTE—PENALTIES FOR VIOLATION.

If an order of a state railroad commission fixing rates to be charged by a railroad company is within the powers of the commission and otherwise legal, a court cannot rightfully pass on the wisdom of the penalties imposed by statute for its violation or the right to impose them.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 131; Dec. Dig. § 70.*]

5. CONSTITUTIONAL LAW (§ 211*)—EQUAL PROTECTION OF LAWS.

It is only when a particular person or class of persons, including corporations, is denied equal privileges in comparison with those extended to others similarly situated, that the provision of Const. U. S. Amend. 14, which guarantees equal protection of the laws, is violated.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 211.*]

6. CONSTITUTIONAL LAW (§ 126*)—IMPAIRMENT OF CONTRACTS--RIGHTS GIVEN IN RAILROAD CHARTER.

Under Const. Ky. § 190, requiring corporations then in existence in the state to accept its provisions in order to have the benefit of future legislation, among which provisions is one that every franchise granted shall be subject to revocation, alteration, or amendment, a railroad company, which filed its acceptance after the passage of Ky. St. § 573 (Russell's St. § 2160), which provides that the provisions of all charters and articles of incorporation inconsistent with its provisions shall stand repealed, and by section 816 (section 5353) prohibits the taking of extortionate rates by any railroad, and also after passage of McChord Act, March 10, 1900 (Laws 1900, c. 2; Ky. St. § 820a; Russell's St. § 5358), authorizing the State Railroad Commission to fix rates, cannot attack the constitutionality of such statute, or of orders made under it, on the ground of impairment of a contract made by its charter authorizing it to charge certain rates.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 325, 366–369; Dec. Dig. § 126.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
186 F.—12

7. COURTS (§ 489*)—JURISDICTION OF FEDERAL COURTS—STATE REGULATION OF
   RATES—VALIDITY OF ORDERS OF STATE COMMISSION.
   The federal courts can review an order of a state railroad commission
   fixing railroad rates, made pursuant to a valid state law, only on the
   ground that it is beyond the authority of the commission, as being con-
   fiscatory.
   [Ed. Note.—For other cases, see Courts, Cent. Dig. § 1324; Dec. Dig.
   § 489.*]

8. COMMERCE (§ 34*)—STATE REGULATION OF RATES—POWERS OF STATE—INDI-
   RECT EFFECT ON INTERSTATE RATES.
   The fact that a railroad company, in making up its schedule of through
   rates filed with the Interstate Commerce Commission, has taken the sum
   of its local rates in each state, does not remove such local rates from the
   jurisdiction of the state for the purpose of regulation. nor does the fact
   that a reduction of local rates by the state may incidentally place the
   company under the business necessity of reducing its interstate rates af-
   fect the legality of such reduction.
   [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 82; Dec
   Dig. § 34.*]

9. CARRIERS (§ 18*)—RATES—REGULATIONS—ENFORCEMENT.
   The individuals to whom the State Commission ordered the railroad
   company, to make repayment of the excessive past rates are necessary
   parties to a bill in equity seeking to set aside the award of repayment.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 16–18; Dec.
   Dig. § 18.*]

10. APPEAL AND ERROR (§ 479*)—SUPERSEDEAS.
    Where the decision is appropriate to be reviewed, and where an abso-
    lute denial of the preliminary injunction would operate to destroy com-
    plainant's alleged rights, the restraining order will be continued pending
    the appeal.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2251–
    2256; Dec. Dig. § 479.*]

In Equity. Suit by the Louisville & Nashville Railroad Company
against Adam T. Siler, Lawrence B. Finn, and Lew P. Tarlton, indi-
vidually and as constituting the Railroad Commission of Kentucky.
On motion for preliminary injunction. Denied.

The complainant brings its bill in equity against defendants as individuals,
and also as officials composing the Railroad Commission of Kentucky. The
complainant was organized as a corporation under a special charter granted
by the state of Kentucky. It is invested with the usual powers of a steam
railroad company, and is maintaining and operating a number of lines of
railroad, comprising a main stem and various divisions and branches within
the state, which are described in the bill by names and mileage. The com-
plainant has its office and principal place of business in the city of Louisville,
and the defendants are the duly qualified and acting members of the Rail-
road Commission mentioned, having their principal office in the city of Frank-
fort, in the Eastern district of the state, of which they are all inhabitants.

Complaint is made that on August 10, 1910, the Railroad Commission, upon
petition of a number of shippers, passed an order declaring certain rates
then exacted by the railroad company for the transportation of certain com-
modities between points named within the state were extortionate, unjust,
and unreasonable, forbidding their further exaction, fixing lower rates, and
declaring them to be just and reasonable, and, further, that the Commis-
sion at the same time passed another order finding that the complaining
parties had paid sums in excess of just and reasonable rates for transporta-
tion of such commodities between the points alluded to, and that each was
by said order awarded a stated sum of money representing such excess.
Quite a number of grounds are stated in the bill against the validity of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

these orders. These grounds, so far as they need be passed upon, are stated in the opinion; but it may be said in passing that the statute under which the orders were made is claimed to be violative alike of certain provisions of the Constitutions of the state of Kentucky and of the United States.

The complainant prayed, among other things, for an injunction to restrain defendants individually, and also jointly as the Railroad Commission, from continuing the orders of August 10th, from recommending or causing to be instituted any prosecution by indictment or otherwise against complainant or its officers, agents, or employés, to recover any fine or penalty imposed by the statute, or on account of complainant's failure or refusal to put the orders, or either of them, into force on any of its lines, from filing a certified copy of the order finding and awarding reparation in the office of the clerk of the circuit court in any of the counties having jurisdiction, or into or through which any of the lines of road are operated concerning which the award was made, or in the office of the clerk of the circuit court of any other county within the state, and that meantime, and until a decision could be had upon complainant's motion for an injunction, a restraining order be granted immediately enjoining the acts in question, and that on final hearing the injunction as prayed be made perpetual, the orders be declared null and void, and that a mandatory injunction be issued commanding defendants to recall and revoke each of the orders, and also that the statute under which the orders were made be declared and adjudged to be in violation alike of the Constitutions of the state of Kentucky and of the United States.

On motion, and a showing of irreparable injury, a restraining order was on September 7, 1910, granted by Judge Cochran in accordance with the prayer of bill, to continue until September 26th of that month, when the motion for an interlocutory injunction would be heard. On the last-named date certain affidavits were filed by the parties, respectively, and on the same date defendants filed two demurrers, one to the whole bill and the other to part of the bill, stating various grounds. But Judge Cochran for good reasons declined to sit further in the case, stating that he would certify this fact to Hon. Henry F. Severens, presiding Circuit Judge. Upon proceedings specially taken Circuit Judge Warrington was designated to sit in the case, and in accordance with the act of Congress approved June 18, 1910 (36 Stat. p. 557, c. 309, § 17), District Judges Sanford and Denison were by the Circuit Judge called to his assistance on the hearing and determination of the application for an interlocutory injunction and all questions arising in the cause. On November 3, 1910, the parties to the cause appeared by their respective counsel, and leave was given to complainant to file an amended bill of complaint, and to defendants to amend their demurrers to conform to the bill of complaint as amended. The cause was argued on that day, and the printed record and briefs were filed on the 25th of the month.

By the amendment it is averred that at the date of the orders in dispute complainant owned and was operating lines of railroad in 57 counties of Kentucky, and that its "average total mileage of railroad lines then operated in that and other states was 4.590.55 miles"; that the rates which the Commission found to be extortionate on August 10, 1910, were less than the maximum charter rates which complainant was authorized to exact; that the new rates fixed by the Commission were arbitrary, unreasonable, and discriminatory for a number of reasons stated, which so far as necessary will be passed on in the opinion.

Albert S. Brandeis, Henry L. Stone, and Wm. G. Dearing, for complainant.

Jas. Breathitt, Atty. Gen., Jno. Francis Lockett, Asst. Atty. Gen., and McChord, Hines & Norman, for defendants.

Before WARRINGTON, Circuit Judge, and SANFORD and DENISON, District Judges.

PER CURIAM. In view of the character of some of the federal questions presented by the averments of the bill as amended and of

the good faith in which the questions are urged, it is scarcely necessary to say that jurisdiction of the cause is vested in this court through the presence of those questions, no matter how it shall be found necessary to decide them, or whether to decide them at all. Siler v. Louisville & N. R. R. Co., 213 U. S. 175, 190, 29 Sup. Ct. 451, 53 L. Ed. 753. The nature of the federal questions made is for the most part like those relied on in that case, and they will be stated as we progress. The power of the Railroad Commission of Kentucky to adopt and enforce the orders in dispute, is denied.

By section 209 of the state Constitution, adopted September 28, 1891, a commission was established, to be known as the "Railroad Commission," comprising three commissioners, whose powers were to be—

"regulated by law; and until otherwise provided by law, the commission so created shall have the same powers and jurisdiction, perform the same duties, be subject to the same regulations and receive the same compensation as now conferred, prescribed and allowed by law to the existing railroad commissioners." Russell's St. Ky. 1909, p. 1622.

March 10, 1900, the General Assembly of Kentucky passed a law, known as the "McChord Act," entitled:

"An act to prevent railroad companies or corporations owning and operating a line, or lines of railroad and its officers, agents, and employés from charging collecting or receiving extortionate freight or passenger rates in this commonwealth, and to further increase and define the duties and powers of the Railroad Commission in reference thereto, and prescribing the manner of enforcing the provisions of this act and penalties for the violation of its provisions." Laws 1900, c. 2; Ky. St. c. 32, § 820a; Russell's St. 1909, pp. 1303, 1304.

The body of the act need not be set out, for it appears in 213 U. S. at page 179, 29 Sup. Ct. 451, 53 L. Ed. 753, as also 183 U. S. at page 484, 22 Sup. Ct. 165, 46 L. Ed. 289, and in 103 Fed. at page 218. The rate order now in dispute was made by the Commission in virtue of this act. As pointed out in the statement, the constitutional validity of the act is challenged under both the state and federal Constitutions. The act has never been passed upon by the Court of Appeals of Kentucky; but it is claimed that certain other statutes which in parts at least were kindred to portions of the McChord act have been passed upon by the Court of Appeals. We shall consider these later.

The McChord act was, however, held to be violative of certain provisions of the state and federal Constitutions in a decision rendered by Judge Evans shortly after the enactment of the law. Louisville & N. R. R. Co. v. McChord, 103 Fed. 216. That suit was one of several brought by a number of railroad companies operating roads within the state, to enjoin the Commission from carrying into effect any of the provisions of the act. Upon appeal directly to the Supreme Court, it was held that the suits and the orders made in them were premature, and the decrees were reversed and the cases remanded, with direction to sustain the demurrers and dismiss the bills. The constitutional validity of the McChord act was not determined. McChord v. Louisville & Nashville Rd. Co., 183 U. S. 483, 22 Sup. Ct. 165, 46 L. Ed. 289.

Later the complainant in the present suit filed a bill in this court to enjoin the enforcement of a certain order made by the Railroad Commission providing maximum rates for the transportation of all commodities by the railroad company to and from all points within the state. The cause was by stipulation submitted to Judge Cochran, who followed the decision of Judge Evans, holding the McChord act to be unconstitutional. Upon direct appeal to the Supreme Court it was again found unnecessary to pass upon the validity of the act, the court holding that "under the statute the Commission had no authority to make a general tariff," and the final decree of the Circuit Court was for that reason affirmed. Siler v. Louisville & Nashville R. R. Co., supra, 213 U. S. 198, 29 Sup. Ct. 457, 53 L. Ed. 753.

We are thus brought to a consideration of the validity of the present orders of the Commission. It appears by the bill that on May 30, 1910, a number of distilling companies located and engaged in Kentucky in the manufacture, storage, and preparation for market and sale of whisky and other distillery supplies and products, and in shipping the same to and from their respective plants, filed a joint petition as plaintiffs with the Railroad Commission against the present complainant, alleging that their respective plants were located upon lines and at certain named stations of the railroad, which are specially set forth in the bill; that in order to operate their distilleries it was necessary for each of the distilling companies to cause to be transported over the railroad lines, from various points shown in an exhibit filed with the petition, certain commodities required in the manufacture and preparation of whisky and other distillery products for the market; that complaint was made in the petition of certain rates which were being exacted for transportation of the commodities mentioned between stated points of origin and destination both within the state of Kentucky, and in connection with the rates so charged certain other rates were set forth for transportation of the same commodities between the same points, which had been charged prior to March 25, 1910; that the rates complained of were in excess of the former rates, and were extortionate, unjust, and unreasonable, while the former rates had been maintained for many years, and were just and reasonable; and that the petitioners prayed that the Commission would, after due notice and investigation, make and fix just and reasonable rates, and not in excess of those charged prior to March 25, 1910. By a second paragraph the petitioners claimed reparation to the extent of the difference between the former rates and the existing rates; the amount claimed by each petitioner being specifically stated, with a prayer accordingly. It is further stated in the original bill:

"The evidence did show, and it is a fact, that on and for a number of years prior to the 25th day of March, A. D. 1910, this complainant did have in effect upon its lines of railroad, from the points of origin aforesaid to said points of destination, rates of transportation covering supplies for distilleries that were established and effective alone for the benefit of owners of distilleries located at said last-named points, and with a purpose to encourage the manufacture of whisky at said points on the lines of railroad of complainant; and it was shown by the evidence at said hearing, and it is a fact, that said rates (all of which were contained in the tariffs of complainant) did not apply to shipments of said supplies from the same points of origin to the same points of destination, when said supplies were in-

tended for other uses than those of the distilleries, but, on the contrary, in such cases, the rates that were contained in its tariffs were, in fact, charged, collected, and received as aforesaid for like supplies when intended for distillery uses. * * * That at all such times said rates, applicable when the supplies were not for the use of distilleries, were the same rates which, under the tariff effective March 25, 1910, were made applicable also to said supplies when for such use; in other words, the difference in the rates based upon the intended uses of the supplies was abolished, but the rates made effective March 25, 1910, as aforesaid, were and are reasonable and just."

Plainly the issues before the Commission involved the question whether the rates which had for years prior to March 25, 1910, been charged for the carriage of distillers' supplies and products within the state of Kentucky, should be restored, and whether the difference between those rates and the rates which had been put into effect on March 25, 1910, and thereafter exacted down to the filing of the petition before the Railroad Commission, was recoverable as reparation. Upon these issues and the evidence adduced, as well as the arguments and briefs of counsel for both sides, the Commission on August 10, 1910, made the two orders. The recitals contained in these orders are alike, so far as they relate to the filing of the written complaint and exhibits, to the transmission of certified copies thereof by mail to the railroad company, to a written communication from the chairman of the Commission advising the railroad company of the general nature of the complaint and fixing a day for the hearing more than 10 days thereafter for the time and place of hearing and the appearance of the parties by their counsel, to the fact of testimony being adduced and the hearings upon both testimony and arguments, including the filing of briefs, and following these in the first order this appears:

"The Commission, now being fully advised, is of the opinion, and so orders, that the rates now charged, collected, and received by defendants for the transportation of the commodities to and from the points hereinafter stated are extortionate, unjust, and unreasonable, and by charging said rates defendant is and has been guilty of extortion. It is therefore, ordered that said defendant, Louisville & Nashville Railroad Company, be and it is hereby forbidden to charge, collect, or receive for the transportation of said commodities to and from said points wholly within the state of Kentucky rates in excess of the following rates for the transportation of said commodities to and from said points, as follows: [See table attached.] The Commission is of the opinion that the foregoing rates so fixed for the transportation of said commodities from and to said points are just and reasonable. It is further ordered that this order be entered upon the records of this office, and a copy thereof, attested by the secretary of the Commission, be furnished defendant."

The table of rates comprises 3 places of origin, viz., Covington, Newport, and Louisville, Ky., and 16 places of destination in that state. The rates are in cents per 100 pounds upon packages, barrels, bottles, etc., containing unnamed articles, while the articles that are named consist of corn, rye, malt or barley, and iron hoops. As we understand these rates, they are the same as the rates that were prior to March 25, 1910, charged for the carriage of distillers' supplies and products, but that they are by the order extended to all shippers of like packages and commodities between the points and along the lines

named, without regard to the occupations of such shippers; whereas the rates put in force by the railroad company on and after March 25, 1910, were the same as those previously exacted of shippers between said points on said lines who were not engaged as distillers. In other words, the uniform standard of rates as fixed by the railroad company on March 25, 1910, was that previously charged to nondistillers, while the uniform standard fixed on August 10, 1910, by the Railroad Commission was the one existing prior to March 25, 1910, in favor only of distillers. For reason stated later it will not be necessary or proper to pass upon the other order of the Commission.

The first objection to the rate order is that the statute in virtue of which it was made in terms confers judicial power upon the Commission in violation of sections 27, 28, 109, and 135 of the state Constitution. The first two of these sections provide for the distribution of the powers of government, legislative, executive, and judicial, and forbid persons in one of these departments from exercising any power belonging to either of the others. By section 109 the judicial power, both as to matters of law and equity, is vested in the Senate when sitting as a court of impeachment, the Court of Appeals, and "the courts established by this Constitution"; and by section 135:

"No courts, save those provided for in this Constitution, shall be established."

As regards the question of rates, it is made the duty of the commission by the McChord act, upon complaint made, or information received, or reason to believe that a railroad company is exacting "extortionate freight or passenger rates, * * * to hear and determine the matter as speedily as possible." The act requires the Commission to give the company complained of not less than 10 days' notice by letter mailed to an officer or employé stating the time and place of hearing, the nature of the complaint or matter to be investigated, and "to hear such statements, arguments or evidence offered by the parties as the Commission may deem relevant." The act further provides that, should the Commission determine that the company is or has been "guilty of extortion," the Commission "shall make and fix a just and reasonable rate," which the company may exact "for like services thereafter rendered." The rates so fixed—

"shall be entered and be an order upon the record book and signed by the Commission and a copy mailed to an officer or employé of the company affected. This rate shall be in force and effect at the expiration of ten days thereafter, and may be revoked and modified by an order likewise entered of record."

The contention is that the words employed in clothing the Commission with authority clearly indicate a design to invest the Commission with judicial power. It is clear that the rate-making power is vested, and that this is legislative in character. But it is said that the exercise of this power is dependent upon the duty "to hear and determine" whether the corporation "is or has been guilty of extortion," and that this duty cannot be performed without exercising judicial power.

Before the McChord act was passed, the General Assembly of Kentucky by section 816 (Russell's St. § 5353) had defined the exaction by any railroad company of "more than a just and reasonable rate of toll and compensation for the transportation of passengers and freight" as "extortion," and had by section 819 (Russell's St. § 5356) penalized such exaction as an offense. But a judgment and verdict of conviction under an indictment charging such offense was reversed in the case of Louisville & Nashville Railroad Co. v. Commonwealth, 99 Ky. 132, 136, 35 S. W. 129 (33 L. R. A. 209, 59 Am. St. Rep. 457), because the statute leaves "uncertain what shall be deemed a just and reasonable rate of toll and compensation." Further, in the course of the opinion it was said (at pages 139, 140, of 99 Ky., and page 131 of 35 S. W. [33 L. R. A. 209, 59 Am. St. Rep. 457]):

"No case can be found, we believe, where such indefinite legislation has been upheld by any court where a crime is sought to be imputed to the accused. Manifestly, in actions by shippers against carriers for recovering back the excess of charges over reasonable rates, the rule is quite different. In such actions the statute may be invoked as merely declaratory of the common law, and the question of reasonable rates is one to be heard by the court or jury."

Apparently the difficulty encountered in that case was sought to be remedied by the McChord act; for the very mode prescribed by the McChord act for the exercise of the rate-making power was calculated to furnish the Commission with the facts necessary to ascertain what a just and reasonable rate would be, and also to put to the test the reasonableness or not of the existing rate. It is hardly conceivable in a contested case that the mind could be prepared to resolve the question of "extortion," or "extortionate rate," without obtaining and considering facts tending to show what would be a fair compensation for the service in issue; and those very facts would inevitably establish a standard for at once fixing a reasonable rate to be charged for the service and testing the character of the existing rate. The circumstance, then, that these two results must necessarily be reached in the manner pointed out, is one that ordinarily attends the exercise of legislative power.

It would therefore seem that the true intendment of the statute respecting rates was to bestow legislative power, rather than judicial power, and that the legislative power given to fix a just and reasonable rate to be enforced in the place and stead of the unreasonable rate necessarily embraced as part of the legislative power itself the right to find the fact of unreasonableness of the existing rate. If this latter right cannot be included in the grant of the legislative power so vested, without violating the provisions of the state Constitution concerning judicial power, it is difficult to see how any rate-making power at all could be granted. We cannot believe that the judicial power, which was designed to be alone vested in the courts mentioned in those provisions, was intended to prevent either the legislative department or the Railroad Commission from investigating into and finding facts which are but the necessary and familiar incidents and conditions to right legislation.

In reaching this conclusion we do not overlook the particular words used, or their sequence, as set forth in the McChord act. Even if

section 816 of the Kentucky Statutes did not survive the decision in Louisville & Nashville Railroad Co. v. Commonwealth, before cited, in the sense that as there stated (99 Ky. 140, 35 S. W. 131 [33 L. R. A. 209, 59 Am. St. Rep. 457]) "the statute may be invoked as merely declaratory of the common law" respecting the legislative meaning intended to be attached to the word "extortion" in its relation to railroad rates—that is, that any charge of "more than a just and reasonable rate" was "extortion"—still one of the accepted meanings of the word "extortion" is to overcharge, and the word could not have been used in any other sense in the McChord act, because the penalties embraced by that statute are not inflicted for practicing extortion through exaction of the old rates, but for exacting "a greater or higher rate, toll or compensation, for like service thereafter rendered than that made and fixed by said Commission." The established common-law meaning of reasonable rates and inhibition of unreasonable rates must then have been in the minds of the lawmakers when using the phrases "fix a just and reasonable rate for freight or passengers" and "guilty of extortion." It should be noted that in Siler v. Louisville & Nashville R. R. Co., 213 U. S. 175, 197, 29 Sup. Ct. 451, 457, 53 L. Ed. 753, Justice Peckham did not seem to observe any vice in the use of the word "extortion." He said:

"The statute, it will be remembered, gives no power to the Commission to fix rates, unless it has already determined that the rates complained of, or which it has investigated upon its own information, are extortionate, after hearing the parties, and then it fixes the rates at a just and reasonable amount. If no extortion is found in any particular rate, there can be no fixing of rates in that particular."

That this Railroad Commission was not exercising judicial power, within the inhibited sense of the state Constitution, is shown, we think, by the decision of the Supreme Court in Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150. The suits there involved were brought to enjoin the Virginia State Corporation Commission from publishing or enforcing its order fixing passenger rates to be charged on railroads operating in the state of Virginia. One of the grounds averred was that the rates were confiscatory. The Commission was created by the state Constitution, and its powers were defined by that instrument and certain statutes passed in pursuance of it. It was invested with legislative, judicial, and executive powers. It was contended that the proceedings before the Commission were proceedings in a court of the state, which the federal courts were by Rev. St. § 720 (U. S. Comp. St. 1901, p. 581), forbidden to enjoin, and that the decision of the Commission made the legality of the rates res adjudicata. The contentions made under the demurrers and pleas necessarily put to the test the nature of the power the Commission was exercising when issuing the orders, receiving and considering the evidence offered, and finally fixing the disputed passenger rates. Speaking for the court in respect of these proceedings, Mr. Justice Holmes said (211 U. S. 226, 29 Sup. Ct. 69 [53 L. Ed. 150]):

"But we think it equally plain that the proceedings drawn in question here are legislative in their nature, and none the less so that they have taken place with a body which at another moment, or in its principal or dominant

aspect, is a court such as is meant by section 720. A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future, and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind. * * *"

## Again (211 U. S. 227, 29 Sup. Ct. 70 [53 L. Ed. 150]):

"And it does not matter what inquiries may have been made as a preliminary to the legislative act. Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision made upon it, is determined by the nature of the act to which the inquiry and decision lead up. * * * So, when the final act is legislative, the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case."

We do not fail to observe the fact that the Virginia Commission does not seem expressly to have been required, as the Kentucky Commission is, to find the existence of extortionate rates as a condition to the right to fix and supplant them by new ones. But, apart from the practical necessity for the Virginia Commission to look into and consider the existing rates, no perceivable distinction is to be found between the nature of the power exercised at the hearing and investigation into evidence of facts upon which the new rates must of necessity be based, and that of the power to pass upon the question of extortionate rates then existing. All such matters are but preliminary and inducive to the exercise of the main power—the legislative rate-making power—and are as certainly mere incidents as are any other facts leading up to the making of the legislative rate; for it must constantly be borne in mind that everything found in such investigation is in effect but collateral to the new rule which is thereafter to be formulated and applied.

This, of course, suggests and we feel keenly the force of the statement made by the late Justice Brewer in Interstate Commerce Commission v. Railway Co., 167 U. S. 479, 499, 17 Sup. Ct. 896, 900 (42 L. Ed. 243):

"It is one thing to inquire whether the rates which have been charged and collected are reasonable—that is a judicial act; but an entirely different thing to prescribe rates which shall be charged in the future—that is a legislative act."

It is to be noticed that the question with which the learned justice was then confronted was whether the Interstate Commerce Commission was possessed of the rate-making power. He was not considering a question like the one we are now endeavoring to solve. He was dealing with a claim that the rate-making power was to be implied from other powers with which the Commission was expressly clothed. It might well have been that an order of the federal Commission finding that any given rates were unreasonable and ordering the railroad company to cease and desist from further exacting such rates, which order would become prima facie evidence of the fact of unreasonableness in any proceeding brought in a court to enforce it, was judicial

in its nature; but if we rightly interpret the decision in Prentis v. Atlantic Coast Line, we are unable to see why a finding of the same character respecting particular rates made by a commission having express power to fix, and with a purpose to fix, new and reasonable rates for future enforcement and operation, should not be regarded as merged in the new rule, and treated as part of the legislative power exercised in adopting the rule. Southern Pac. Co. v. Bartine, 170 Fed. 725, 775. Indeed, Justice Brewer must have had in mind, when using the language before quoted, a principle similar to that expressed in Prentis v. Atlantic Coast Line; for at an earlier stage of his opinion in Interstate Com. Commission v. Railway Co., he said (167 U. S. 494, 17 Sup. Ct. 898 [42 L. Ed. 243]):

"Congress might itself prescribe the rates; it might commit to some subordinate tribunal this duty; or it might leave with the companies the right to fix rates, subject to regulations and restrictions, as well as to that rule which is as old as the existence of common carriers, to wit, that rates must be reasonable."

While it is true, as before stated, that the Kentucky Court of Appeals has not passed upon the question now under consideration, yet it has decided one or two questions which are so far kindred as in some degree to disclose that court's views of the powers of the Commission. Louisville & Nashville Railroad Co. v. Commonwealth, 106 Ky. 633, 51 S. W. 164, 1012, 90 Am. St. Rep. 236, decided less than a year before the passage of the McChord act, was an appeal by the railroad company from a judgment of conviction under an indictment for violating the long and short haul clause provision of the statute of the state. The statute was enacted in pursuance of section 218 of the state Constitution, which forbids a railroad company to charge greater compensation for transporting passengers or property under substantially similar circumstances and conditions for a shorter than for a longer distance over the same line in the same direction, the shorter being included within the longer distance, subject, however, to a proviso that upon application to the Railroad Commission the carrier may after an investigation by the Commission be authorized to charge less for longer than for shorter distances, and the Commission may from time to time prescribe the extent to which such carrier may be relieved from the operation of the section. To carry this into effect, the statute was enacted making a violation of a provision similar to one contained in the section an offense, and imposing a fine of not less than $100 nor more than $300, to be recoverable by indictment in a named circuit court. The matter in controversy concerned the transportation of coal; the company charging a greater sum for a shorter distance than it charged for longer distances. The company justified the difference in rates on the ground that it was necessitated by competition. The matter had pursuant to the statute been submitted to the Railroad Commission, and after investigation had upon notice and hearing that body made an order in writing "declining to exonerate the company from the operation of the provisions" of the statute, and thereafter, at its suggestion, appellant was indicted, found guilty and fined. In the course of the opinion of the court it was said (106 Ky. 638, 51 S. W. 166 [90 Am. St. Rep. 236]):

"To hold that only railroad men understand rates, or that they shall be allowed alone to fix the rates, and that no tribunal can review their decision as to what rates are reasonable, is to put in their hands a power dangerous to the welfare of the community. * * * It was the aim of the Constitution to require the railroads in the state to treat all localities fairly and with equality; but, as differences of conditions ever varying would constantly arise, it prescribed no fixed rule, but created a tribunal to act as umpire between the railroads and the people, and decide when and to what extent a greater charge might be made for a short than for a long haul under like circumstances and conditions. * * * "

Again (106 Ky. 640, 51 S. W. 166 [90 Am. St. Rep. 236]):

"The power to determine this matter must be vested somewhere, and, the Constitution having created a special tribunal for this purpose, we cannot see that its provisions are subject to any of the objections raised by appellant."

It is true that no new rates were in that case fixed by the Commission; but since the Constitution and statute forbade exaction of the charges if the transportation in both instances was furnished "under substantially similar circumstances and conditions," the Commission necessarily passed upon that question when adopting its order or refusal as certainly as it would have decided it if the order had been to exonerate. The inevitable effect of its conclusion was that the company's rates were unreasonable. In principle nothing more than this respecting the exercise of judicial power was done in the present case. The case was taken to the Supreme Court of the United States (Louisville & Nash. Rd. Co. v. Kentucky, 183 U. S. 503, 515, 22 Sup. Ct. 95, 46 L. Ed. 298), and that tribunal, in spite of the existing federal rule respecting long and short hauls, felt itself bound to accept the meaning of the state enactment as construed by the state court, and, passing upon the federal questions presented, affirmed the Court of Appeals.

Still another order of the Railroad Commission was upheld by the Court of Appeals in Commonwealth v. Louisville & Nashville Railroad Co., 120 Ky. 91, 85 S. W. 712. The action was one to compel the railroad company through mandatory process to furnish greater facilities for the transportation of passengers and freight between points named in the state. It appeared that a proceeding was begun before the Railroad Commission against the railroad company, and upon due notice a hearing was had by the Commission upon evidence. The Commission decided that the public had a right to the use of "local passenger and freight train service over the railroad from Shelbyville to Christiansburg as demanded." The company refused to comply with the Commission's order. One of the defenses was that the expense of compliance would entail upon the railroad company a heavy and continuous loss. Under certain statutory provisions railroad companies were required to run at least one passenger train each way on every day of the year, Sundays excepted. It was said in the opinion (120 Ky. 104, 85 S. W. 715):

"The power to regulate the relative rights and duties of the railroads and the public in this state has, in large measure, been delegated by the Legislature to the Railroad Commission, and, the provisions of the statute under which the commissioners acted in this case being reasonable, we can but conclude from the facts disclosed by the record that their determination of

the questions presented by the complaint upon which they acted was proper, and for the convenience of the public. Therefore the recommendation made by them should have been obeyed by the railroad companies; but, they having failed to do so, appellant could but resort to the courts for relief."

See, also, Pennington v. Wolfolk, 79 Ky. 13, which sanctioned the vesting of power not judicial in the county court. That was done under an earlier Constitution, but apparently not differing materially from the present one touching distribution of powers.

It is not disputed that the rate-making power is legislative in character (McChord v. Louisville & Nashville Rd. Co. [before cited] 183 U. S. 483, 495, 22 Sup. Ct. 165, 46 L. Ed. 289; Prentis v. Atlantic Coast Line [before cited] 211 U. S. 210, 226, 29 Sup. Ct. 67, 53 L. Ed. 150; Louisville & Nashville Rd. Co. v. Interstate Commerce Commission [decided April 10, 1910, by the Circuit Judges of the Sixth Circuit, Judge Severens announcing the opinion] 184 Fed. 118); nor that the power may be delegated (Louisville & Nashville Rd. Co. v. Interstate Commerce Commission, supra; Atlantic Coast Line v. N. C. Corp. Com., 206 U. S. 1, 19, 27 Sup. Ct. 585, 51 L. Ed. 933; Vil. of Saratoga Spgs. v. Saratoga G. Co., 191 N. Y. 123, 132–140, 146, 83 N. E. 693, 18 L. R. A. [N. S.] 713, presenting a review of New York and federal decisions concerning doctrine of delegated authority, and as to delegated power to fix rates). We are therefore constrained to hold that the McChord act is not violative of the judicial clauses of the Constitution of the state of Kentucky.

Another objection made to the constitutional validity of the McChord act is that neither that act nor any other contains a provision for appeal to any court from a final order of the Commission declaring an existing rate extortionate. This objection may be considered in connection with a still further one that is made on account of the penalties prescribed by the act. Both of these objections are in terms founded upon averments of the bill as amended and claims urged in argument, that the absence of the right of appeal and the severity of the penalties imposed are alike violative of the due process and equal protection clauses of section 1 of the fourteenth amendment.

As regards the claim that the constitutional guaranty of due process is violated by the rate order, the inquiry is whether the bill and affidavits show that complainant would through enforcement of the new rates be deprived of property. No averment is made either in terms or effect that the new rates would not yield a profit to the carrier; much less that the entire business would not do so. In the absence of a showing that property is taken, the protection of this guaranty cannot be invoked. What may be a reasonable rate or return, as a matter of legal policy, having due regard to encouraging the investment of capital in railroad enterprises is one question; but when the inquiry becomes a judicial problem, to be considered as involving the taking or not taking of the railroad's property, it is essentially a different question. The lawmakers, dealing with the legislative problem, might think that in successful business years a maximum return, for example, of 10 per cent. upon the investment would be reasonable. The courts, dealing with the judicial problem, are affected by locality

and attending risks and circumstances involved in the particular case, and apparently insist only upon a minimum return to the owner of property devoted to public use which will be reasonable (say, for example, 6 per cent.) upon the properly computed investment. An illustration of this rule may be found in the announcement made by Justice Peckham in Willcox v. Consolidated Gas. Co., 212 U. S. 19, 20, 29 Sup. Ct. 192, 53 L. Ed. 382:

"There is no rule as to any particular rate which any corporation subject to legislative control in the matter has a right to obtain without legislative interference. It depends upon circumstances and locality. In this particular case with reference to the risk attending the business and the locality where it is carried on, the complainant is entitled to a return, if it is possible, of 6 per cent. upon the fair value of its property actually used in its business of supplying gas."

In City of Owensboro v. Cumberland Telephone & Telegraph Co., 174 Fed. 739, 747, 99 C. C. A. 1, 9, it was said by the present Mr. Justice Lurton respecting certain rates in dispute:

"It is plain that the rates of such a company may not be reduced to a point below a rate which will pay operating expenses, maintain the plant, and return a fair profit upon the capital actually invested."

It is to be observed of the decisions in those cases that the justices were speaking of the entire property and earnings of the companies involved. But there seems to be a distinction made between cases "in which a public service is distinctly intended and rendered," and cases "in which, without any intent of public service, the owners have placed their property in such a position that the public has an interest in its use." Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 93, 22 Sup. Ct. 30, 36, 46 L. Ed. 92. Thus, as respects the former class, in Minneapolis & St. Louis Rd. v. Minnesota, 186 U. S. 257, 267, 22 Sup. Ct. 900, 904, 46 L. Ed. 1151, where certain coal rates as fixed by a state railroad commission were involved, and one of the questions was "whether the tariff fixed by the Commission is wholly inadequate and not compensatory," Mr. Justice Brown said:

"While we have never decided that the Commission may compel such reductions, we do not think it beyond the power of the state Commission to reduce the freight upon a particular article, provided the companies are able to earn a fair profit upon their entire business, and that the burden is upon them to impeach the action of the Commission in this particular."

See, also, San Diego Land Company v. National City, 174 U. S. 739, 754, 19 Sup. Ct. 804, 43 L. Ed. 1154.

There is, then, manifest room for vagueness and ambiguity in employing a word like "unreasonable" to characterize a rate. What might be regarded by a carrier as unreasonable might be considered by a court as just and reasonable.

Now, turning to the bill and affidavits in the present case, we find general averments that the new rates are unreasonable and absurdly low, etc. But the bill does not clearly tender an issue that can be said to involve confiscatory rates, and complainant's counsel state in their brief that complainant is not bound in this case to allege or prove that the new rates are confiscatory, and upon an oral argument the same counsel expressly disclaimed a purpose to rely upon any

contention that the new rates are confiscatory. This concession, we think, was but natural, in view of the history of the rates which the railroad company voluntarily maintained for years prior to March 25, 1910, as before pointed out. No averment is made touching the proportions in volume of distillers' traffic and of nondistillers' traffic, and it could not be assumed that the company had been carrying distillers' supplies and products at confiscatory rates, nor that the extension of those rates to all similar traffic on the lines in question would amount to the confiscation of property. In view, therefore, of the bill and the disclaimer of counsel, we think that argumentative statements like those contained in the form of affidavits should be, for the purposes of this preliminary injunction, disregarded. The result is that the rates in dispute must, so far, at least, as they are applicable to traffic originating and carried wholly within the state, be treated at this stage of the case as not unreasonable, in the sense of being confiscatory, but, on the contrary, as just and reasonable, and consequently as within the power of the Commission.

The issue, then, if any can be said to arise on this branch of the case, under the due process clause, is not presented through averment of facts, but by argument based on the legislative failure, through the McChord act or other statute, to provide for a judicial review of a rate-making order. It must be borne in mind, however, that the McChord act in terms provides for notice to the railroad company and a hearing, and a hearing before any rate-making order can be made, and that complainant was notified of the complaint and given opportunity to be heard upon it, and was in fact heard both by evidence and argument before the order was adopted, and, moreover, that the act further provides that no such order shall take effect until a copy of it is mailed to a representative of the railroad company, and until the expiration of 10 days thereafter. Was it necessary to provide both of the remedies mentioned, or at least the one for judicial review after the passage of a rate-making order, to avoid violation of the guaranty of due process?

In Cin., N. O. & Texas Pac. R. R. v. Commonwealth, 81 Ky. 492, 498, 502, 504, 505, complaint was made against an order of the Railroad Commission of Kentucky equalizing and increasing taxes laid upon railroad property. The companies were required through specified officers to make annual return under oath to the Auditor of Public Accounts of the mileage and average value per mile of the railroads, etc. Lack of due process was urged on the theory that there was no provision for notice and hearing before the order was made, or for revising or reviewing the order after it was made. It was not that the railroad companies did not have actual notice, or that they were not in truth heard, or even that the valuation placed was too high (pages 498, 502, 504, 505). After speaking of the term "due process of law" (page 509), Judge Pryor, in announcing the opinion of the court, said of the Commission (page 512):

"The time and place of the meeting, having been fixed by law, is notice to all, and if the reports of the chief officers of these corporations are to be regarded as an assessment and the commissioners a board of review, the act provides that they shall assemble at the Auditor's office in Frankfort, on

the 1st day of September in each year, for the purpose of fixing valuations, and with that view are required to examine the reports made by the officers of the roads. This is notice to the companies, and to require actual notice to every one interested, if this board has supervisory power over all property in state, would be altogether impracticable; nor will it answer to say that, because there are only a few lines of railroad within the state, actual notice could be readily given, for the courts would then be determining the constitutionality of the act by the extent of their supervisory power. As we construe the act, although in the nature of an original assessment, the parties had the right to be heard. and were in fact heard, before the board passing on the question of valuation."

The decision was affirmed in Kentucky Railroad Tax Cases, 115 U. S. 321, 333, 6 Sup. Ct. 57, 61, 29 L. Ed. 414. Justice Matthews, speaking for the court and of the annual return above mentioned, said:

"This return, made by the corporation through its officers in the statement of its own case, in all the particulars that entered into the question of the value of its taxable property, may be verified and fortified by such explanations and proofs as it may see fit to insert."

The learned Justice at a later portion of the opinion (115 U. S. 335, 6 Sup. Ct. 57 [29 L. Ed. 414]) disposed of a claim that there was no security against the arbitrary action of the Commission by stating that the possibility of such a result was but the necessary imperfection of all human institutions, which admits of no remedy. He also alluded to the fact that the tax had ultimately to be enforced by judicial proceedings. These decisions met with approval in San Diego Land Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, upon grounds which we regard as controlling. The decision in the San Diego Case involved the validity of constitutional, statutory, and municipal provisions for the regulation of water rates. One ground of objection was that those provisions did not furnish due process of law. One thing to be observed of the relevancy of the decision to the present case is the comment there made upon decisions involving railroad rate-making power. After distinguishing the case of Chicago, Milwaukee, etc., Railway v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462. 702, 33 L. Ed. 970, on the grounds that the Supreme Court of Minnesota had held that the state statute in question made the action of the Commission final and conclusive as to railroad rates and that the railroad companies were not at liberty in any form or at any time to questin them (174 U. S. 748, 19 Sup. Ct. 809 [43 L. Ed. 1154]), Mr. Justice Harlan, in delivering the opinion of the court and speaking of the necessity of notice to appellant before fixing the water rates, said (174 U. S. 752, 19 Sup. Ct. 809 [43 L. Ed. 1154]):

"Was the appellant entitled to formal notice as to the precise day upon which the water rates would be fixed by ordinance? We think not. The Constitution itself was notice of the fact that ordinances or resolutions fixing rates would be passed annually in the month of February in each year and would take effect on the 1st day of July thereafter. It was made by statute the duty of the appellee at least 30 days prior to the 15th day of January in each year to obtain from the appellant a detailed statement showing the names of water rate payers, the amount paid by each during the preceding year, and 'all revenue derived from all sources,' and the 'expenditures made for supplying water during said time.' It was the right and duty of appellant in January of each. month [year] to make a detailed statement, under oath, showing every fact necessary to a proper conclusion as to the

rates that should be allowed by ordinance. * * * Provision was thus made for a hearing in an appropriate way. The defendant's board could not have refused to receive the statement referred to in the statute, or to have duly considered it and given it proper weight in determining rates."

Allusion to the Kentucky Railroad Tax Cases, supra, follows, and then the learned Justice proceeds (174 U. S. 753, 19 Sup. Ct. 809 [43 L. Ed. 1154]):

"There is no ground to say that the appellant did not in fact have or was denied an opportunity to be heard upon the question of rates. On the contrary, it appears in evidence that the subject of rates was considered in conferences between the local authorities and the officers of the appellant. Those officers may not have been present at the final meeting of the city board, when the ordinance complained of was passed."

In view of the provisions made by the McChord act for notice and hearing, and the actual hearing and trial had upon evidence and argument in the instant case, we think it falls fairly within the decisions in the Kentucky Railroad Tax Cases and the San Diego Case. It can make no difference that the order so made upon notice and trial was final. As said by Justice Shiras respecting an order of this very Commission in Louisville & Nash. Rd. Co. v. Kentucky, 183 U. S. 503, 515, 22 Sup. Ct. 95, 100, 46 L. Ed. 298:

"Finality is a characteristic of the judgment of all tribunals, unless the laws provide for a review. Nothing is more common than the appointment of juries or commissioners to find the value of land taken for public use, or to assess damages to them, whose findings are deemed final."

Hence the present case does not fall within the ban of those decisions which deal with statutes or with orders of subordinate bodies denying both notice and hearing, or with rates either admittedly or manifestly confiscatory.

As regards the penalties fixed by the McChord act, the most that can be claimed is that through their excessive character the officers and agents of complainant, and also its property, would be imperiled by resort to judicial proceedings for the purpose of contesting the validity of the order fixing new rates. It is true that these penalties are severe. The provision is:

"And should said railroad company or corporation, or any officer, agent or employé thereof charge, collect or receive a greater or higher rate, toll or compensation for like services thereafter rendered than that made and fixed by said Commission, as herein provided, said company or corporation, and said officer, agent or employé shall each be deemed guilty of extortion, and upon conviction shall be fined for the first offense in any sum not less than five hundred dollars, nor more than one thousand dollars, and upon a second conviction, in any sum not less than one thousand dollars, nor more than two thousand dollars, and for the third and succeeding convictions in any sum not less than two thousand dollars nor more than five thousand dollars."

It is claimed in behalf of the Commission that under certain decisions of the Court of Appeals there can be but one offense, and one penalty of $1,000 for that offense; but on behalf of complainant these decisions are sought to be distinguished on the ground that the statutes there involved related only to a single person or company, while here the act relates, not only to the carrier, but to each of its officers,

186 F.—13

agents, and employés, in the sense that each could be prosecuted for committing the first, second, third, and subsequent offenses. It is also urged by the Commission that the penalties clause could be held void, and the rest of the act valid. Further, the Commission has presented affidavits disavowing any purpose to try to enforce the order through the penalties, at least until the validity of the order has been passed upon in a civil suit. It would seem that an order fixing just rates could be enforced in Kentucky by civil action. Commonwealth v. Louisville & Nashville R. R., 120 Ky. 91, 85 S. W. 712; section 273 of the Civil Code of Kentucky.

If, then, the order fixing new rates is within the power of the Commission, a court cannot rightfully pass upon the wisdom of the penalties or the right to impose them. The question comes to be whether the railroad company is entitled to complain of the amount of fines, where it cannot aver and maintain that the rates to be violated are confiscatory. Surely this case is not like that of Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932. There the charge was that the rates were confiscatory, and the very drastic nature of the penalties, involving imprisonment, was calculated to deter the representatives of the railroad companies from attempting by judicial proceedings to protect the property against confiscation. In the course of the opinion Justice Peckham said (209 U. S. 147, 28 Sup. Ct. 449 [52 L. Ed. 714, 13 L. R. A. (N. S.) 932]):

"In the case, however, of the establishment of certain rates without any hearing, the validity of such rates necessarily depends upon whether they are high enough to permit at least some return upon the investment (how much it is not now necessary to state) and an inquiry as to that fact is a proper subject of judicial investigation. If it turns out that the rates are too low for that purpose, then they are illegal. Now, to impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given) only upon the condition that, if unsuccessful, he must suffer imprisonment and pay fines as provided in these acts, is, in effect, to close up all approaches to the courts, and thus prevent any hearing upon the question whether the rates as provided by the acts are not too low, and therefore invalid."

What we have said in respect of due process concerning new rates and the effect of the penalties applies in large measure to the claim respecting the additional guaranty of equal protection of the laws. If the rates in dispute are reasonable in the sense before pointed out, the complainant is manifestly accorded, both by the order and the statute, the same rights and privileges that are rightfully granted to every other railroad carrier. This is equally true as to the penalties. It is only when a particular person or class of persons (including corporations) is denied equal privileges, on comparison with those extended to others similarly situated, that the equal protection guaranteed by the fourteenth amendment applies. It cannot be necessary to comment upon the class of well-known decisions, which recognize and declare this rule. We, however, cite Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 335, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Louisville & Nashville R. R. Co. v. Melton, 218 U. S. 36, 52, 30 Sup. Ct. 676, 54 L. Ed. 921; Mobile, Jackson & Kansas City R.

R. Co. v. Turnipseed, Adm'r (decided December 10, 1910) 219 U. S. 35, 31 Sup. Ct. 136, 55 L. Ed. ——.

Complainant urges that its own rate-making power and its maximum rates were fixed by a special charter granted by the state prior to the date of the present Constitution, and are so far contractual as to prevent either the state or its Commission from interfering with the company's rights in this regard. The claim is that the railroad's rates, which were supplanted by the Commission's rates, were lower than those authorized to be exacted by the charter, and that the supplanted rates cannot, therefore, be said to be unreasonable, or the new rates reasonable. The contention, of course, is that the order of the Commission impairs the obligation of the charter contract, within the meaning of the inhibiting clause in that respect of the federal Constitution.

It is provided by section 3 of the Kentucky Bill of Rights that:

"Every grant of a franchise, privilege or exemption shall remain subject to revocation, alteration or amendment."

By section 59 of the state Constitution the General Assembly is forbidden to pass a local or special act giving to "any person or corporation the right to lay a railroad track or tramway, or to amend existing charters for such purposes." And by section 190:

"No corporation in existence at the time of the adoption of this Constitution shall have the benefit of future legislation without first filing in the office of the Secretary of State an acceptance of the provisions of this Constitution."

It is averred in the bill that by a resolution of its board of directors, adopted July 11, 1902, complainant accepted the provisions of the present Constitution, and also the provisions of chapter 32 of the Kentucky Statutes, enacted April 5, 1893. That chapter applies to private corporations, including railroad companies and the Railroad Commission. The first article of the chapter relates to "General Provisions" and includes section 573 (Russell's St. § 2160):

"The provisions of all charters and articles of incorporation, whether granted by special act of the General Assembly or obtained under any general incorporation law, which are inconsistent with the provisions of this chapter concerning similar corporations to the extent of such conflict, and all powers, privileges or immunities of any such corporation which could not be obtained under the provisions of this chapter, shall stand repealed on September 28, 1897. * * *"

Section 816, to which we have alluded as having been involved in the decision of Louisville & Nashville R. R. Co. v. Commonwealth, 99 Ky. 132, 35 S. W. 129, 33 L. R. A. 209, 59 Am. St. Rep. 457, was embraced in article 5, tit. "Railroads," of chapter 32 (Russell's St. §§ 5320–5418), and nearly two years prior to the acceptance by complainant of the Constitution the McChord act was passed. Even if complainant's right to maintain its charter rates was not repealed by section 573 in connection with 816, it is clear that such right was repealed through enactment of the McChord law and complainant's subsequent acceptance of the provisions of the Constitution. It cannot be either that complainant's charter rates or its rate-making power could survive and remain paramount to the rate-making power cre-

ated by the McChord act. The absolute inconsistency of such powers is apparent. Further, it is stated in the bill:

"That the contract between the complainant * * * and the common-wealth of Kentucky became and is no longer irrevocable or irrepealable."

But it is averred that the contract remains intact, and has never been repealed or revoked by any act of the Legislature, and the obligation thereof at the date of making the order in question was still in full force and effect. The argument in substance is that there has been no express repeal, and that none can be implied. But we think a complete answer to all this is to be found in the decision announced by Mr. Justice White in Mo. Pac. Ry. Co. v. Kansas, 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472. It was claimed in that case that the Railroad Commission of Kansas could not by order require the company to run trains over the portion of its line which was maintained in the state of Kansas, because of its charter provision vesting in it the right to determine the time and manner of operating such trains. One of the reasons assigned was that:

"As the Legislature had not expressly amended or repealed the right, such a result should not be made to flow from the section conferring powers upon the Commission, as repeals by implication were not favored." 216 U. S. 272, 30 Sup. Ct. 334 (54 L. Ed. 472).

After referring to certain propositions stated and of a purpose to consider them, the learned Chief Justice said (216 U. S. 274, 30 Sup. Ct. 334 [54 L. Ed. 472]):

"Before doing so, however, we dispose of the question concerning the alleged impairment of a contract right, protected by the Constitution of the United States, which is formulated in the fourth proposition, by pointing out the twofold contradiction upon which the proposition is based. As it is not denied that the asserted charter right was held subject to the power of the state to repeal, alter, or amend, it follows that the proposition amounts simply to saying that an irrepealable contract right arose from a contract which was repealable. Hammond Packing Co. v. Arkansas, 212 U. S. 322, 345 [29 Sup. Ct. 370, 53 L. Ed. 530]. Stating the contention in a different form, the same contradiction becomes apparent. As the argument concedes the existence of the legislative power to repeal, alter, or amend, and as it is impossible to assume that a legislative act had impaired a contract, without by the same token declaring that such act has either repealed, altered, or amended, hence the proposition relied upon really contends that the contract has been unlawfully impaired by the exercise of a power which it is conceded could lawfully repeal the contract."

A principle for finally testing the validity of the order now in question is stated in Louisville & Nashville Railroad Co. v. Interstate Commerce Commission, supra, where, respecting the reasonableness or not of an order, Judge Severens said:

"It is at this point that the judicial power over the subject may be invoked. And the rule by which it is exercised is that it will not interfere with the action of the Commission, unless it clearly appears that it is beyond its authority and injuriously affects some substantial right of the complainant—is confiscatory, to use that term in its broad sense. Whether it is so or not is the test of reasonableness in such a controversy."

This principle was announced by Mr. Justice White in Interstate Com. Comm. v. Ill. Cent. R. R. Co., 215 U. S. 452, 470, 30 Sup. Ct. 155, 160 (54 L. Ed. 280):

"Power to make the order, and not the more expediency or wisdom of having made it, is the question."

We have thus far considered the new rates with respect to transportation commencing and ending at points within the state of Kentucky. But they must be subjected to a still further test. It is insisted by complainant's counsel that the order of the Commission reducing the rates on certain commodities directly and necessarily affects interstate commerce, and is in conflict with the act to regulate commerce. The averments in this behalf of the bill as amended are made up rather of conclusions of counsel than of definite statements of fact. As stated by Justice Peckham in Equitable Life Assurance Co. v. Brown, 213 U. S. 25, 43, 29 Sup. Ct. 404, 409, 53 L. Ed. 682:

"We are not called upon to cite authorities for the statement that a demurrer only admits facts well pleaded in the pleading demurred to. It does not admit the pleader's conclusions of law, nor does it admit the correctness of any opinion set forth in the bill," etc.

As an example, see Southern Railway v. King, 217 U. S. 524, 536, 30 Sup. Ct. 594, 54 L. Ed. 868. However, it may be that some of the averments are sufficient to warrant the introduction of evidence in their support.

One averment in form is that the McChord act "is in express and direct interference with and regulation of interstate commerce" (paragraph 9 of bill). We have no hesitancy in saying that the act is not open to any such interpretation, nor in affirming that nothing is to be found in the rate order in dispute, or in any fact either averred or shown, tending to disclose a design on the part of the Commission to interfere with or to regulate interstate commerce. When we consider the bill and affidavits, in connection with assertions made in the brief of complainant, we infer that it is intended to set up general classes of facts and specific facts as follows: A certain volume of interstate traffic, in corn, rye, barley, malt, and other brewers' supplies, is constantly moving from points north of the Ohio river, through Covington or Newport, to some of the interior points named in the order. Some of this originates at Cincinnati, some further north. The existing through rate from Cincinnati is and has been the same as from Covington or Newport, and the through rate from points north of and beyond Cincinnati is and has been the same as the rate from those points to the Ohio river plus the rate south of the river. A car of rye from Cincinnati to Bardstown, Ky., is typical of this through traffic, and upon this car (minimum) the present rate from Cincinnati would be $38.40, and the new rate from Covington would be $24. The fair and reasonable charge for transporting this car from Cincinnati to Covington would not exceed (for example) $5. Under the new rates, this car load could be shipped from Cincinnati to Bardstown for not to exceed $29. As a matter of fact, we infer it is meant to say, all through shipments of such cars from Cincinnati to Bardstown would cease, unless complainant should, as it would for business reasons, reduce the through rates to (for example) $29. A substantially similar state of facts exists at the Louisville gateway with reference to Louisville and Jeffersonville. (This state of facts is made to appear by tables set out in the brief.) It is averred that

the enforcement of the new rates will cause an annual loss of $15,600 to complainant in its rates on local shipments, and a further annual loss of $3,000 in its rates on interstate shipments; and it is stated by affidavit that there are no through rates on the articles in question from points outside the state to points within the state; such charges being assessed by combining the rates from points of origin to Louisville, to Covington, or to Newport (at which points such shipments enter the state), with the rates from those points to the points of destination in Kentucky.

Since it is to the interest of both parties to this case that the actual facts should be made to appear by proper pleadings, we have concluded to say that the complainant may, if it sees fit, amend its bill so far as it truthfully can aver the facts just recited, and which we infer from the sources of information before pointed out to exist.

Assuming, for present purposes, that such or a similar state of facts as those indicated were averred and could be proved, could it be rightly concluded that putting the new rates into effect would operate as a direct interference with and regulation of interstate commerce? If it would, it needs no argument to show that such enforcement would be violative of the federal commerce clause. It is plain enough that reduction in receipts would be one of the results of enforcement of the new rates; but it does not seem to us to follow that any of the figures adduced show direct interference with interstate rates, any more than they show unreasonable or confiscatory local rates. Such a depletion of revenue would seem rather to be an indirect result of a proper exercise of purely state power. The alleged loss of $3,000, to be suffered, it is said, on the through traffic, we cannot accept as a statement of necessary legal consequence, because to do so would be to assume the direct effect which is in question. The loss alleged is apparently the same in principle as would be a loss or expense resulting from a due exercise of the universally recognized police power residing in the state. It is to be observed that the railroad company has made up its interstate rates by uniting its local rates with rates charged either by itself or by other companies for transportation outside of Kentucky; the bill averring that the full amount of complainant's "existing local rates in Kentucky enters into and forms a part, in most instances, of its through rates (set forth in its tariff filed with the Interstate Commerce Commission on or about March 25, 1910 * * *) on such interstate shipments of freight belonging to the same classes." Can it be that such combining and filing of local rates as interstate rates remove such local rates altogether from the jurisdiction of the state for purely state purposes?

Surely Congress did not intend, by the interstate commerce acts, that interstate rates, made and filed as plaintiff's have been, should thereafter operate, not merely as interstate rates, but also as intrastate rates. To say that Congress so meant is to ascribe to that body the purpose to take over to itself the whole rate-making power, both federal and state. The only theory upon which such a claim can be urged is that Congress has provided that interstate rates shall be filed with the Interstate Commerce Commission, and shall not thereafter be

changed, except in a prescribed time and manner; and so the rates thus filed amount to an adoption by Congress or its Commission, in the sense that the rates exist and must be enforced as federal-made rates. But it is expressly provided in each of the interstate commerce acts, that the act shall not apply to the transportation of passengers or property "wholly within one state, and not shipped to or from a foreign country from or to any state or territory." Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154); Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149); Act June 18, 1910, c. 309, § 6, 36 Stat. 544. Moreover, although the interstate rates of complainant from Jeffersonville, Ind., or from Cincinnati, Ohio, to Bardstown, Ky., are the same as the rates charged from Louisville, Covington, and Newport, Ky., still complainant's adherence to its interstate rates, and its observance of the new local rates in dispute, would not, under the interstate commerce act, be regarded as an intent to discriminate against localities like Jeffersonville or Cincinnati. Saunders v. Southern Express Co., 18 Interst. Com. Com'n R., 415, 421. Again, the state-made rates are not regarded by the Interstate Commerce Commission as binding "as a necessary measure of the interstate rate." Saunders v. Southern Express Co., supra (421); Hope Cotton Oil Co. v. Tex. & Pac. Ry. Co., 12 Interst. Com. Com'n R. 265, 269. Conversely, under these decisions it is difficult to see why the state should be bound to adopt interstate rates; for, although the federal power is supreme respecting interstate rates, that would leave the state with no power at all in regard to local rates.

What is claimed is that conditions existing in Kentucky do not warrant a greater charge for the carriage of freight within Kentucky as interstate freight than for the carriage of purely local freight; and the averment that the company will make a reduction of its interstate rates to correspond with the rates in dispute states nothing more than that it will do this for strictly business reasons. The question, then, comes at last to this: Whether a business or economic policy of a railroad company, as distinguished from a legal duty, to change its interstate rates to correspond with just and reasonable local rates imposed by the state for the transportation of traffic originating and ending wholly within the state, can be said to be a direct, and not merely an indirect, effect of the state's action. Thus, in distinguishing direct from indirect effect, can such conditions be made the basis of a presumption of fact, equivalent to a rule of law, such as a federal statute forbidding interstate rates from exceeding the sum of the local rates between given interstate points? One difference between such presumption and rule is the uncertainty whether the railroad company in the end, at its election, will not decline to yield to the conditions created by the two sets of rates—interstate and local rates—and so defeat any presumption of fact that might be indulged in its favor by the courts, while the rule of law may always be certainly enforced through judicial decision. Another difference is that any election by the company to change the interstate rates would seem to be an intervening cause, and consequently render such change an

indirect result. Without deciding whether there may be facts attending the administration of a state law which show a result so inevitable, for business reasons, that the result should be held to be the direct effect of the law, though not specified in the law, yet as applied to this case the fallacy of ascribing equality to the presumption of fact and rule of law in both conclusive and permanent effect may, we think, be further tested by the consequences. The logic of the company's argument would release its local rates from governmental regulation altogether; for the United States could not fix the local rates, because they are local, and the state could not change them, because it would thereby cast a direct burden on interstate commerce. The inevitable effect would be that, so far as rate-making is concerned, the State Railroad Commission would have no reason to exist, and state regulation of state rates would become simply historic. Before accepting such a doctrine, let us briefly recall the views of the court of last resort touching the power of the state to regulate commerce carried on exclusively within its borders.

In Gibbons v. Ogden, 9 Wheat. 1, 194, 6 L. Ed. 23, Chief Justice Marshall, after defining the meaning of the words of the commerce clause, said:

"It is not intended to say that those words comprehend that commerce which is completely internal, which is carried on between man and man in a state, or between different parts of the same state, and which does not extend to or affect other states."

This rule has ever since been recognized as sound. As late as the decision rendered in the Employer's Liability Cases, 207 U. S. 463, 28 Sup. Ct. 141, 52 L. Ed. 297, Mr. Justice White, in announcing the opinion of the court, accepted the doctrine, both as to the United States and the states, as laid down by Chief Justice Marshall in Gibbons v. Ogden. After setting out the rule concerning the power of the United States, he said (207 U. S. 493, 28 Sup. Ct. 143 [52 L. Ed. 297]):

"Accepting, as we now do and as has always been done, this comprehensive statement of the power of Congress, we also adopt and reiterate the perspicuous statement made in the same case (9 Wheat. 194 [6 L. Ed. 23]), of those matters of state control which are not embraced in the grant of authority to Congress to regulate commerce" (setting out the portion of the decision in Gibbons v. Ogden above quoted).

We may call attention, also, to the language of Justice Miller in Wabash, etc., Ry. Co. v. Illinois, 118 U. S. 557, 565, 7 Sup. Ct. 4, 30 L. Ed. 244; also of the same learned Justice in Chicago, etc., Ry. Co. v. Minnesota, 134 U. S. 418, 459, 10 Sup. Ct. 462, 703, 33 L. Ed. 970, "In regard to the business of common carriers limited to points within a single state, that state has the legislative power to establish the rates of compensation for such carriage;" and also the language of Mr. Justice Harlan in Northern Securities Co. v. United States, 193 U. S. 197, 350, 24 Sup. Ct. 436, 48 L. Ed. 679.

Must this long-established power be now so construed as to eliminate the local rate-making power? We have seen that Congress has not so enacted. It has expressly provided that it shall not be. True, that body has not recognized any right in a state directly to hamper

or burden interstate commerce; and all courts recognize the supremacy of the federal power to regulate commerce among the states. Whether Congress has the power to forbid indirect interference with commerce among the states we need not consider; for we do not discover any attempt on its part to exercise such a power. We may now turn to the consideration of some decisions which we think present features of analogy to the present question.

In Louisville & Nashville Rd. Co. v. Eubank, 184 U. S. 27, 33, 22 Sup. Ct. 277, 279 (46 L. Ed. 416) the validity of section 218 of the Constitution of Kentucky was reaffirmed by the Supreme Court:

"We have already held, in the case of Louisville & Nashville Railroad Company v. Kentucky, 183 U. S. 503. 518 [22 Sup. Ct. 95, 46 L. Ed. 298], that the section of the Kentucky Constitution above set forth, as applied to places all of which are within the state, violates no provision of the federal Constitution."

The action of the Commission failed, because it attempted to employ an interstate rate between Nashville and Louisville as a standard for determining whether a local rate between points within Kentucky over the same road as that over which the interstate rate prevailed was a violation of the long and short haul clause of section 218. It was in effect held that the act of the Commission was a direct attempt to regulate interstate commerce. But in answer to a case, assumed in argument, which supposed several states to have fixed local rates within their respective borders and Congress to have fixed their sum as the rate for interstate commerce, claiming that this did not regulate or interfere with the state rates already, or from time to time adopted by the states, Justice Peckham said (184 U. S. 42, 22 Sup. Ct. 282 [46 L. Ed. 416]):

"In thus fixing the interstate rate, Congress may most seriously interfere with or regulate interstate commerce, but that it has the right to do; and, on the other hand, the state by such a statute regulates the local rate, but that it has the right to do. Congress does not, directly or indirectly, interfere with local rates, by adopting their sum in the interstate rate."

We take it that we may with propriety say that we do not observe anything laid down in the opinion of the court in that case which is inconsistent with the following language of Justice Brewer, who announced the minority opinion (184 U. S. 48, 22 Sup. Ct. 285 [46 L. Ed. 416]):

"I do not suppose it will be seriously contended that the defendant can invalidate all the local rates which the Legislature of Kentucky may see fit to enforce, by simply saying that outside of the state it somewhere touches a competitive point, and is forced to reduce its interstate rates by reason of the competition there existing."

It will not escape notice that in the present case the Commission fixed the new local rates without reference to any interstate rate or traffic whatever. Its action was based solely upon local conditions and local traffic, and was in substantial part a restoration of old local rates, which the company itself had created and had for years recognized as just and reasonable.

The company, in the exercise of its rate-making power, changed the local rates which it had previously maintained, and included and

made them a part of its through rates. Treating the Commission as representing the state in the exercise of its power to prescribe local rates, it is clear that certain of the principles laid down in the opinion of the court in the Eubank Case, and before quoted in part, tend to sustain the order in dispute.

In Louisville & Nashville Rd. Co. v. Kentucky, supra, Justice Shiras said (183 U. S. 518, 22 Sup. Ct. 102 [46 L. Ed. 298]):

"It may be that the enforcement of state regulation forbidding discrimination in rates in the case of articles of a like kind carried for different distances over the same line may somewhat affect commerce generally; but we have frequently held that such a result is too remote and indirect to be regarded as an interference with interstate commerce, and that the interference with the commercial power of the general government to be unlawful must be direct, and not merely the incidental effect of enforcing the police power of a state."

In Mo. Pac. Ry. Co. v. Kansas (before cited) 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472, the question was presented whether the railroad company could be compelled, by mandamus issued by the state court, to obey an order of the Kansas Board of Railroad Commissioners requiring it to operate a passenger train between a point within the state and the state line. The road in question was built originally as a branch line within the state of Kansas, but was operated as a part of a road in Missouri, so that the line in question extended from Madison, Kan., to Monteith Junction, Mo.; 89 miles being in Kansas and 19 miles in Missouri. There were no terminal facilities at Monteith Junction, and the trains did not remain over at that point, but were run as far as Butler Station, where terminal facilities exist. Among the defenses set up was one that the road was an interstate line, and could be operated only as such, and was not subject to the jurisdiction of the state Railroad Commission for that reason, and also that the burden of furnishing such passenger train service would be confiscatory. Two questions were considered by the court—one the alleged arbitrary and unreasonable character of the order, and the other that the order operated as a direct burden upon interstate commerce. Both of these questions were resolved against the company. The order there made was found to be within the power of the Commission, and in that feature is analogous to the present order, and, furthermore, the holding that the order did not place a direct burden upon interstate commerce has an important bearing upon the question now under consideration. The contention respecting the effect of the order upon interstate commerce was disposed of by the present Chief Justice (216 U. S. 283, 30 Sup. Ct. 337 [54 L. Ed. 472]):

"But this simply confounds the distinction between state control over local traffic and federal control over interstate traffic. To sustain the proposition would require it to be held that the local traffic of the road was free from all governmental regulation. * * *"

Further, speaking of the effect of interstate commerce, the learned Chief Justice said (216 U. S. 284, 30 Sup. Ct. 338 [54 L. Ed. 472]):

"The order cannot be said to be an unreasonable exertion of authority, because the power manifested was made operative to the limit of the right

to do so. Besides, the proposition erroneously assumes that the effect of the order is to direct the stoppage at the state line of an interstate train, when in fact the order does not deal with an interstate train, or put any burden upon such train, but simply requires the operating within the state of a local train, the duty to operate which arises from a charter obligation."

Again, answering a claim that, as there were no terminal facilities at the state line, the train would have to be operated, not only to the state line, but 20 miles beyond, to Butler, it was said:

"But under the hypothesis upon which the contention rests the operation of the train to Butler would be at the mere election of the corporation, and, besides, even if the performance of the duty of furnishing adequate local facilities in some respects affected interstate commerce, it does not necessarily result that thereby a direct burden on interstate commerce would be imposed."

Now, when it is recalled that one of the claims made here is that the reduction of the local rates between points on the south side of the Ohio river (like Louisville, Covington, and Newport) and Bardstown will for business or economic reasons necessitate a corresponding reduction of the Jeffersonville and Cincinnati rates to Bardstown, not to speak of points north of those cities, it is hard to distinguish such a claim from that urged by the railroad company in the Kansas case in regard to the absence of terminal facilities at the state line and the consequent necessity to operate 20 miles further, to Butler. This latter claim was based alone upon a business or economic reason, but the answer of the Chief Justice was that this "would be at the mere election of the corporation." This answer is equally applicable to the complaint made here. This right of election signifies choice between alternatives, in the sense that either or any one of them may be rightfully selected. The choice is to be exercised by the company. It follows that the burden on interstate rates complained of here is one that may or may not be assumed by the company, according to its financial interests. It does not follow that its averment of a present intent to assume the burden will practically be either a necessary or wise choice of alternatives, much less that the company will continue to carry the burden. The important point, however, is that the Supreme Court has declared that such a burden is not in its effect direct.

We do not pass upon the validity of the second order of the Commission. We think that the persons and companies in whose favor awards of reparation appear by the order to have been made are necessary parties in interest. They have not been brought into the suit.

It follows that the motion for an interlocutory injunction in both its branches must be denied. However, the questions involved are of such importance that we assume that a review of our conclusions will be desired by complainant, pursuant to the special provision for such review found in section 17 of the act of June 18, 1910. If the Supreme Court, on such review, shall decide that complainant was entitled to this injunction, then it is apparent that our present refusal to grant the injunction would result in irremediable injury, on account of failure to preserve the status quo. Applying the reasons of the rule stated in Hovey v. McDonald, 109 U. S. 150, 161, 3 Sup. Ct.

136, 27 L. Ed. 888, and further stated in Cotting v. Kansas City Stockyards Co., supra, 183 U. S. 79, 80, 22 Sup. Ct. 30, 46 L. Ed. 92, we have concluded that the restraining order of September 7, 1910, should be continued until an opportunity has been given for the complainant to secure a review, and subject to conditions which will be prescribed in the order to be entered.

In order that the right of appeal directly to the Supreme Court from our decision upon the motion for an interlocutory injunction may not be embarrassed, we refrain at the present time from passing upon the demurrers.